THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LAMONT BAGGETT, Defendant-Appellant.

First District (2nd Division)   No. 82—14

Opinion filed June 7, 1983.

Steven Clark, of State Appellate Defender's Office, of Chicago, and Richard E. Neville, of Walsh & Neville, Ltd., of Chicago, *pro bono*, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, and Harry John Devereux, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PERLIN delivered the opinion of the court:

In a jury trial, defendant, Lamont Baggett, was found guilty of murder and armed violence and judgment was entered on the verdicts. The trial court thereafter vacated the judgment on the armed violence verdict and sentenced defendant to serve 30 years in the Illinois Department of Corrections for murder. On appeal, defendant contends that the trial court improperly refused the jury's request to review testimony and coerced the jury into returning a verdict; that the jury was not properly instructed; that he was not proved guilty beyond a reasonable doubt; that the court unduly limited defense counsel's cross-examination of two State witnesses; and that the court improperly restricted defendant from testifying as to his state of mind immediately prior to the shooting. For the reasons which follow, we affirm.

At trial, the State's evidence disclosed that on May 26, 1980, at approximately 9 p.m., Venita Richey was visiting her grandmother, Virgie Booker, in Booker's apartment on North Lockwood Street in Chicago. Shortly after 9 p.m., Kenneth Jackson, whose family lived in the same apartment building, and Verdell Richey, Venita's brother, went to Booker's apartment to drive Venita home. Venita, Verdell, Jackson and defendant left the apartment and walked to the patio at the rear of the apartment building. Jackson then asked defendant, "Who do you think you are, you're pussy, you ain't nothing." Keith

Perry, Jackson's cousin, who was waiting for him outside of Booker's apartment, also heard Jackson tell defendant, "You need a little pussy."

Venita, Verdell, Jackson, Perry and defendant all walked to the front of the building where Jackson's blue Vega was parked. Jackson sat in the driver's seat. Perry began to sit down in the back seat of the car but got out when Venita entered the car. Verdell and defendant were standing near a fence talking but as Jackson and Venita were about to leave, defendant approached the car holding a gun in his right hand. Defendant started poking Jackson with the gun and Venita heard defendant say, "I told you to stop f[------] with me, didn't I, I told you to leave me alone." Jackson put his arms close to his chest. According to Perry and Verdell, defendant said, "What do I care about going to jail, you ain't s[---], next time I'm going to kill your mother f[--- ---] ass." Perry testified that Jackson replied, "Okay, man, I'm just playing." Defendant then shot Jackson once, placed the gun in his pants and ran north on Lockwood. Venita testified that defendant shot Jackson at a distance of between six inches and one foot; Verdell stated that the weapon was about "a foot, more or less" from Jackson when it was fired.

After being shot, Jackson opened the car door, got out, walked a few steps and collapsed. Jackson's father, Roosevelt Jackson, came out of the family's apartment and saw his son lying on the grass. He observed that his son had been shot and noticed that his son's car was parked on the southeast corner of Race and Lockwood with the engine running. He got into the car, backed it up 15 to 20 feet, rolled up the window on the driver's side and exited the car. There were bloodstains on the car seat. Kenneth Jackson later died at St. Anne's Hospital.

Dr. Uksel Konacki, who performed the autopsy, discovered three external wounds on Jackson's body: a bullet entry wound on Jackson's inner left arm near the fifth finger, an exit wound on the inner left arm near the thumb, and an entry wound near the left nipple. Dr. Konacki was unable to determine whether all three external wounds were caused by the same bullet. Death was caused by bullet lacerations of the heart and lungs.

Dr. Konacki testified that a bullet fired at close range could cause "stippling," *i.e.*, the speckling of embedded gunpowder particles around an entrance wound. Although he found no evidence of stippling around any of Jackson's wounds, he did not perform a microscopic examination for powder residue. Dr. Konacki did not state at what exact distance stippling could occur.

Defendant testified to the following:

On the day of the shooting, May 26, 1980, he went to Virgie Booker's apartment to visit Venita Richey. Venita's brother Verdell and Kenneth Jackson were also present. When it was time for Venita to go home, Jackson told defendant to leave. Venita, Verdell, Jackson and defendant then left the apartment building together. They walked out to Jackson's Vega. Jackson called defendant a "punk, fag sissy" and threatened to "kick [his] ass."

Venita sat on the passenger side of the car and Jackson sat in the driver's seat. Verdell stood next to the open door on the driver's side talking with Jackson. Defendant started to leave but Jackson called him back. Defendant walked around the front of the car and stopped near the driver's side door. Jackson told defendant that he did not want "to catch [him] around there any more." Jackson reached up and shoved defendant who pushed him back. Verdell then handed Jackson a gun through the open car door. Jackson grabbed the weapon with his right hand and pointed it at defendant. Defendant stepped back and said, "No, don't do that." When defendant was four to five feet from the car, defendant pulled his own gun from his pants, closed his eyes and fired. Defendant ran to his mother's house after the shooting. Defendant fired the gun because he was scared.

Defendant also testified that he was not upset that Jackson called him names in front of Venita nor was he bothered by the fact that Jackson told him not to return to Booker's apartment. Defendant admitted that prior to May 26, 1980, he had known both Venita and Verdell Richey but stated that he had not met Kenneth Jackson until the day of the shooting. The first time defendant saw Keith Perry was in court.

## I

■ Defendant contends that the trial court improperly refused the jury's request to review the testimony and coerced the jury into returning a verdict. The facts pertinent to this discussion are as follows:

The jury began its deliberations in this case shortly after 3 p.m. At 9 p.m., the foreman sent word to the trial judge that the jury had a question. The foreman stated that the jury had come to an impasse and had not been able to reach a verdict. The foreman at first requested additional evidence, but the court replied that it could not provide such evidence. The foreman then stated that the jury's question concerned clarification of existing testimony. The judge allowed the foreman to ask the question, and the following exchange took

place:

"FOREMAN: There was an exhibit here number one of the Defense which shows the car which has initials and 'x's indicating a location where a gun was passed from one person to the deceased.

This opening. Now at one time during the trial we were lead [sic] to believe that the door was shut. And that the window was down.

That was not brought to light today and it seems to be one of the main problems in coming to a conclusion.

THE COURT: There's no way that I can answer that for you. Whatever you collectively or recall individually collectively, I don't think I could answer it even if I were permitted to.

FOREMAN: What do we do at this point that we have come to an impasse.

THE COURT: Because of that?

FOREMAN: Apparently, so.

THE COURT: Well all I can do is give you more time. It is now nine o'clock. In about half an hour we'll have to make overnight arrangements for you but the rules of procedure just do not permit it.

FOREMAN: We cannot go over testimony?

THE COURT: No."

Defendant submits that the court erred in refusing the jury's request. It is within the discretion of the trial court to allow or to refuse a request for the review of testimony. (*People v. Pierce* (1974), 56 Ill. 2d 361, 364, 308 N.E.2d 577.) There is error, however, when a trial court refuses to exercise discretion in the erroneous belief that it has no discretion as to the question presented. (*People v. Queen* (1974), 56 Ill. 2d 560, 565, 310 N.E.2d 166.) Interpreting the foreman's question as a request for the review of testimony, defendant argues that the court committed reversible error in denying this request. We believe the premise of defendant's argument is erroneous.

When the colloquy between the foreman and the court is considered in its entirety, it does not appear that the jury wanted to review any specific portion of the trial testimony. The foreman's inquiry indicated that the jury was familiar with the evidence. Rather, it appears that the jury sought guidance from the court to help resolve a conflict in the evidence.

A trial judge does not abuse his discretion when he refuses to answer an improper question and directs the jury to continue its deliberations. (*People v. Kelly* (1980), 89 Ill. App. 3d 400, 405, 411

N.E.2d 1012.) The court may decline to answer a question which would require the judge to answer with a conclusion based on his own evaluation of the evidence. (*People v. Williams* (1975), 60 Ill. 2d 1, 12-13, 322 N.E.2d 819.) In the instant case, the judge refused to answer the foreman's inquiry apparently because his answer necessarily would have reflected his own opinion of the evidence. We find no error in this. While defendant maintains that the judge's comment, "Because of that?" had the effect of telling the jury that the disputed point was not important to its deliberations, we are unable to place such an interpretation on this comment. From our reading of the record, we conclude that the court's remark was merely another way of asking whether there were other reasons for the impasse in deliberations.

■ Defendant also argues that the trial judge coerced a verdict when he informed the jury that, "In about half an hour we'll have to make overnight arrangements for you, ***." We cannot agree.

The jurors had been deliberating for approximately six hours and knew that it was late. They may well have been tired and in need of rest. Without being advised that there was a limit as to how long they would have to deliberate before they would be sequestered, the jurors might have felt pressured to reach an immediate decision. The trial judge's comments had the effect of removing and not of creating any such pressure. Informing a jury that it might be sequestered cannot be considered coercive. (See *People v. Green* (1980), 91 Ill. App. 3d 1085, 1091, 415 N.E.2d 595.) In our judgment, the record fails to show that the trial judge coerced a verdict.

## II

■ The jury in this case was instructed on the elements of voluntary manslaughter under section 9—2(b) (unreasonable belief in self-defense) of the Criminal Code of 1961. (Ill. Rev. Stat. 1979, ch. 38, par. 9—2(b).) In his second argument, defendant contends that the jury also should have been instructed on the elements of voluntary manslaughter under section 9—2(a) (serious provocation) which states, in part:

> "A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) the individual killed, or
> ***
>
> Serious provocation is conduct sufficient to excite an intense

passion in a reasonable person." Ill. Rev. Stat. 1979, ch. 38, par. 9—2(a).

The supreme court has repeatedly held that "[a] defendant is entitled to the benefit of any defense shown by the entire evidence, even if the facts on which such defense is based are inconsistent with the defendant's own testimony" (*People v. Scalisi* (1926), 324 Ill. 131, 145, 154 N.E. 715; *People v. Papas* (1942), 381 Ill. 90, 96, 44 N.E.2d 896; *People v. Izzo* (1958), 14 Ill. 2d 203, 211, 151 N.E.2d 329) and that "very slight evidence upon a given theory of a case will justify the giving of an instruction." (*People v. Khamis* (1951), 411 Ill. 46, 53, 103 N.E.2d 133; *People v. Kalpak* (1957), 10 Ill. 2d 411, 425, 140 N.E.2d 726.) Nevertheless, the "very slight evidence" test does establish a minimum standard to be met before instructions are required. "To hold otherwise would permit a defendant to demand unlimited instructions, which are wholly unrelated to the case but are based upon the merest factual reference or witness's comment." (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540-41, 349 N.E.2d 31.) With these principles in mind, we turn to a review of the evidence which defendant cites in support of his argument that instructions on the elements of voluntary manslaughter under section 9—2(a) were required in this instance.

Defendant claims that there was evidence of serious provocation because of the names Jackson called him and because of their "shoving match" which defendant characterizes as "mutual combat."

"Passion on the part of the slayer, no matter how violent will not relieve him from liability for murder unless it is engendered by a provocation which the law recognizes as being reasonable and adequate. If the provocation is not sufficient the crime is murder. It is the general rule that language, however aggravated, abusive, opprobrious, or indecent, is not sufficient provocation to reduce a killing committed with a deadly weapon from murder to manslaughter. [Citations.] The rule does not apply where as a result of insulting or opprobrious words, the parties become suddenly heated, and engage in a mutual combat, *fighting on equal terms*, and death results from the combat. [Citation.]

The term mutual combat has been defined as one into which both parties enter willingly, or in which two persons, upon a sudden quarrel, and in hot blood, mutually fight upon equal terms. 15 C.J.S. p. 358.

A slight provocation will not be adequate since the provocation must be proportionate to the manner in which the accused

retaliated and therefore if accused on a slight provocation attacked deceased with violence out of all proportion to the provocation and killed him the crime is murder. This is especially true if the homicide was committed with a deadly weapon. [Citations.]" *People v. Matthews* (1974), 21 Ill. App. 3d 249, 253, 314 N.E.2d 15.

In our judgment, shooting someone is a disproportionate response to being called names and being shoved one time. Moreover, defendant testified that he was not disturbed by the names Jackson called him nor was he upset that Jackson told him not to return to Booker's apartment. Defendant also testified that he shot the deceased because he was "scared." None of the other witnesses testified to any conduct which would indicate that defendant shot the deceased because he was provoked. We conclude that defendant did not present evidence which would have entitled him to a voluntary manslaughter instruction under section 9—2(a) of the Criminal Code of 1961.

In his second argument, defendant also raises certain objections to the armed violence instructions. In light of the fact that the trial court vacated the judgment of conviction on this offense, we need not address them.

### III

■ Defendant contends that he was not proved guilty beyond a reasonable doubt of murder. At trial, Kenneth Jackson's cousin, Keith Perry, testified that he observed defendant shoot Jackson. Perry, however, did not discuss the shooting with anyone for eight or nine months thereafter. And Verdell Richey could not recall with certainty whether Perry was present when Jackson was shot. Defendant cites *People v. Coulson* (1958), 13 Ill. 2d 290, 297, 149 N.E.2d 96, for the proposition that "[w]here testimony is contrary to the laws of nature, or universal human experience, [a court of review] is not bound to believe the witness." According to defendant, the fact that Perry did not mention the shooting to anyone for eight or nine months and then gave a detailed account of the incident is too improbable to be believed. We cannot agree.

In our judgment, Perry's testimony is not so inherently improbable that it could not be believed. At best, Perry's dilatory actions in reporting what he had witnessed merely affects his credibility, a matter for the jury to decide. (*People v. Spates* (1978), 62 Ill. App. 3d 890, 893, 379 N.E.2d 869.) Furthermore, Perry's account of the incident was corroborated by Venita and Verdell Richey. Defendant, however, asserts that their testimony was contradicted by the "physical evi-

dence."

Venita Richey testified that when defendant shot Jackson, the gun was between six inches and one foot from the victim. Verdell Richey estimated that the distance was "a foot, more or less." Dr. Konacki, however, discovered no evidence of stippling which normally is found when a person has been shot at close range. Defendant thus concludes that the physical evidence contradicts the eyewitness accounts of Venita and Verdell Richey. We note, though, that Dr. Konacki did not explain what he meant by "close range." Moreover, the eyewitnesses' estimates were imprecise. The accuracy of those estimates and the weight to be given them were matters for the jury to resolve.

Defendant also argues that since he testified that Jackson was armed, the State was required to prove beyond a reasonable doubt that Jackson did not have a gun and that defendant therefore did not act in self-defense. Defendant maintains that it was incumbent upon the State to establish that no one removed Jackson's gun prior to the arrival of the police.

Both Venita and Verdell Richey testified that Jackson did not have a gun. Whether Jackson was in fact armed was an issue for the jury to decide. A jury is not obligated to accept as true defendant's testimony concerning self-defense. Rather, in weighing the evidence, the jury must consider the probability or improbability of the testimony, the circumstances surrounding the killing, and the testimony of other witnesses. (*People v. Perez* (1981), 100 Ill. App. 3d 901, 905, 427 N.E.2d 229.) In our judgment, there was sufficient evidence to support the jury's verdict that defendant was guilty of murder.

## IV

Defendant contends further that his counsel was unduly unlimited in his cross-examination of Roosevelt Jackson, the victim's father, and Verdell Richey.

Jackson testified that when he moved his son's car, he rolled up the car window. At defendant's first trial, which ended in a mistrial, Roosevelt did not mention this fact. Defense counsel asserted that his testimony at the second trial had been fabricated and wanted to impeach him by proving that at the first trial he had not referred to raising the car window. The trial court ruled that the prior testimony did not form a proper basis for impeachment by omission. Defendant's attorney, however, was allowed to ask Roosevelt whether, prior to September 30, 1981, the date on which he testified at the first trial, he had told the prosecutors that he had rolled up the window of his

son's car. Roosevelt answered affirmatively.

Matters of impeachment are within the sound discretion of the trial court. (*O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 951, 364 N.E.2d 533.) In *People v. Brown* (1977), 47 Ill. App. 3d 920, 928-29, 365 N.E.2d 514, the appellate court stated:

"The omission of a witness to state a particular fact under circumstances rendering it incumbent upon him to, or likely that he would state such fact, if true, may be shown to discredit his testimony as to such fact. The omission must be material ***. *** If the court fails to allow the impeachment by omission, reversal is not required unless manifest prejudice to the defendant results. [Citation.]"

Defendant has not established that it was incumbent upon Roosevelt to have mentioned at the first trial the fact that he rolled up the car window; that this omission was material and affected his credibility; or that defendant was manifestly prejudiced as a result. Accordingly, we find no error in the trial court's refusal to allow defense counsel to pursue this line of questioning.

Defendant also contends that his counsel was improperly restricted in cross-examining Verdell Richey with regard to whether Verdell saw Keith Perry at the scene of the shooting. We note, however, that after a sidebar discussion, defense counsel was allowed both to impeach Verdell and to ask him questions about his former testimony concerning Perry's presence at the shooting. Defendant's argument is not supported by the record.

## V

Finally, defendant contends that he was prevented from testifying as to his state of mind immediately prior to the shooting.

Since the intention or belief of the accused is a material fact in self-defense cases, the defendant must be allowed to testify directly to that fact. (*People v. Pernell* (1979), 72 Ill. App. 3d 664, 667, 391 N.E.2d 85.) When a defendant raises the issue of self-defense, a trial court commits reversible error if it fails to permit a defendant to testify directly as to his state of mind and the circumstances surrounding his acts. (*People v. Kline* (1980), 90 Ill. App. 3d 1008, 1014, 414 N.E.2d 141.) Defendant argues that he was not allowed to relate his state of mind. The record discloses the following testimony by defendant on this point:

DEFENSE COUNSEL: At this point how did you feel, Lamont?

DEFENDANT: Scared because.

PROSECUTOR: Objection.

THE COURT: Objection sustained.

PROSECUTOR: Ask that his answer be stricken.

DEFENSE COUNSEL: When you saw the gun in his hand, what did you feel like?

PROSECUTOR: Objection.

THE COURT: Objection's sustained.

DEFENSE COUNSEL: Now you say that you backed up?

DEFENDANT: Yes, sir.

DEFENSE COUNSEL: What did you do at that time?

DEFENDANT: I backed up, pulled out my gun and closed my eyes and fired one shot.

DEFENSE COUNSEL: Why did you take your gun out?

DEFENDANT: *Because I was scared.* \*\*\*" (Emphasis added.)

Despite defendant's testimony that he was "scared," defendant now contends that the effect of the trial court's rulings prevented him from presenting a "clear picture" that he believed his life was in danger and that it was necessary that he resort to deadly force. We cannot agree. The record reflects that defendant testified that Jackson grabbed a gun and pointed it at him; and that he stepped back a few feet and shot Jackson because he was scared. The inference seems obvious that defendant was afraid that Jackson was going to shoot him. Thus, in our opinion, the trial court in the instant case did in fact permit defendant to testify as to his state of mind immediately prior to the shooting.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING, P.J., and HARTMAN, J., concur.