THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
DONALD ISHMAEL, Defendant-Appellant.

Second District   No. 2—82—0814

Opinion filed July 26, 1984.

Frank J. Giampoli, of St. Charles, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Judith M. Pietrucha, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

In a jury trial, defendant, Donald Ishmael, was found guilty of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)) and sentenced to a 20-year term of imprisonment. He raises the following issues on appeal: (1) whether the trial court erred in refusing defendant's tendered involuntary manslaughter instruction; (2) whether the trial

court erred in allowing the prosecutor to comment on defendant's failure to cooperate with the State-appointed psychiatrist; and (3) whether the trial court erred in allowing the State to ask improper questions on cross-examination.

On May 31, 1982, defendant shot and killed his wife, Judith. The shooting occurred during a card game in defendant's dining room. Defendant, his wife Judith, a relative of defendant's, and Hector Rodriguez (Hector) and his wife were present. Hector testified that defendant was keeping score during the card game and that at one point Judith told defendant that he had written down the wrong score. Judith then stated to defendant that "as many times as you've been to school you still don't know how to add." Defendant responded by saying, "Keep it up, I'll put you on your funeral. They'll put you in a casket, they slap the casket closed and they'll take you away."

At this point, Judith turned to Antoinette Rodriguez (Toni), Hector's wife, and said she was not going to say anything more to these "assholes." Judith then began to take a drink of iced tea. Defendant hit the bottom of the glass while Judith was drinking, causing the glass to hit her mouth and spill. Judith asked defendant if he would like to wear the tea and defendant responded, "I'll smash your faceplate in."

After another hand of cards had been dealt, defendant "made a statement about a little." Judith commented that "you should be used to that, you know, you always had a little in your hand." Hector believed this comment referred to defendant's penis. Everybody, except defendant, laughed. Defendant then knocked Judith's plastic tea glass over and smashed it on top of the table. Defendant reached for Judith's throat, hesitated, then pulled his hand back. He got up and pushed Judith, went behind her chair, picked it up, put it back down, and walked into the kitchen. Hector heard a noise from the kitchen, then defendant returned to the dining room and uprooted a large plant. He then picked up the pot the plant had been in and slammed it to the floor. Judith said to defendant, "Why don't you leave *** but if it makes you feel better, just go ahead and break everything in the house." Defendant said, "I don't make any comments [about] your small tits, I don't make any comments about your big ass." Defendant then went into the kitchen and punched the wall "where there was some kind of a little carrier, by the phone." Defendant then walked behind Hector and put his hands on a hutch. He released the hutch and walked behind Hector and another card player. Hector testified that then "I heard a slap. I heard a cock, I

looked, there was the gun. He had cocked it back. He pointed the gun in her face and said, 'I will blow your brains out', and fired."

Hector testified that defendant had shown him the gun several days before the shooting while they were out together at a bar. Defendant said at that time that a "shotgun shell" would be the first bullet that would be fired from the gun. Toni Rodriguez gave a substantially similar account of the shooting.

Dr. J.E. Habegger, a pathologist, testified that during an autopsy of Judith he recovered many small pellets inside her head. His opinion was that death was caused by a gunshot into the brain.

Arthur Holmes, Judith's father, testified that approximately one month prior to the shooting he had returned the gun used in the shooting to defendant. Defendant had given it to him some time previously. The gun was loaded at the time he returned it to defendant and defendant placed it on top of the hutch at that time. Defendant had requested the return of the gun for protection.

Defendant testified on his own behalf that three weeks prior to the shooting he and Judith agreed to "quit cutting each other down." Shortly after this agreement, defendant's six-year-old daughter told him that she had seen Judith and Hector kissing. Judith and Hector denied this. Defendant testified that within the two weeks prior to the shooting he would come home and find things Hector had brought to his home, while defendant was at work. Defendant believed Judith was having an affair with Hector.

Defendant testified that he bought the gun for protection because of a prior burglary at his house. The gun was normally kept unloaded. He believed that the shot shell he had described in Hector's presence several days prior to the shooting would not hurt a person if you shot him with it. He told Judith to put the shot shell in the first chamber at any time she loaded the gun.

Defendant testified that during the card game Judith made a comment about defendant's inability to add. He hit the bottom of the glass from which she was drinking and said, "You better watch out for your nose" or something similar. Judith said to Toni that she was not going to talk to these "assholes" any more. Defendant stated that she often referred to him as an "asshole" and that her calling him this had been a part of their prior discussion about not cutting each other down. When defendant commented about having a lot of little ones in his hand of cards, Judith said, "You should be used to having something small in your hand, that's the story of your life, you know." Defendant believed she was referring to his penis and the others laughed.

Defendant then smashed Judith's glass and told her she should not have said that because of their prior discussion. He got up, moved Judith's chair to get around her and she pushed him. He pushed her out of the way and went into the kitchen where he believed he heard her call him an asshole again. Defendant broke the casing around the phone. Judith said, "Why don't you go ahead and break everything." Defendant then hit the letter holder and broke it. Defendant returned to the dining room and uprooted a plant. Judith pushed him. Defendant picked up the pot the plant had been in and threw it to the floor. Defendant turned away, Judith mumbled something, and the next thing defendant remembered was a sound like a firecracker going off in a tunnel. Defendant then "[l]ike, woke up out of a sleep" and saw Judith falling and the gun in his hand. Defendant threw the gun down and rushed to try to help Judith.

He testified that, at the time, he did not know the gun was on top of the hutch, and did not know if it was loaded or unloaded. He testified he did not intend to kill Judith.

On cross-examination, over defense objection, defendant testified that on advice of counsel he did not talk with the State-appointed psychiatrist. He told the psychiatrist he would talk to him if his attorney would allow it.

Defendant was asked on cross-examination if he remembered saying in front of Deputy Lawler, "Why didn't she leave me, just leave me alone. I walked into the other room, got the gun from the hutch, then I shot her, I shot her right here ***." Defendant did not remember saying this.

Defendant was then excused as a witness, but later recalled for further cross-examination, over defense objection, after defendant had introduced a tape recording of police department communications. During this additional cross-examination defendant was asked if during the month before the shooting he told Mike Vera he would dent Judith's faceplate in. Defendant denied saying this. Defendant was also asked if he told Walter Emerson during that month that he would blow Judith's brains away. Defendant denied making this statement.

At this point defense counsel moved for a mistrial, claiming that the State asked this question of defendant when it knew Walter Emerson had been present in court throughout the trial and therefore could not be called to complete the impeachment. This motion was denied. The State did not call Deputy Lawler, Mike Vera, or Walter Emerson in rebuttal to testify that defendant had made these statements to them.

Robert James Burton testified for defendant. On cross-examination, he was asked if he ever told Walter Emerson or Mike Vera that he heard defendant say he was going to blow Judith's brains away. He denied making such statements. Again, neither Vera nor Emerson testified in rebuttal.

A psychiatrist, Dr. Rossiter, and a psychologist, Dr. Ostrov, testified for defendant. Dr. Rossiter had examined defendant and Dr. Ostrov was called to answer a hypothetical question based on the facts of the case. Their testimony was that defendant acted under a sudden and intense passion resulting from a serious provocation. Several character witnesses testified defendant had a good reputation for being peaceful and law abiding.

■■ ■ Defendant first argues that the trial court erred in refusing to give his tendered involuntary manslaughter instruction. He maintains that where there is some evidence in the record that would support a reduction from murder to involuntary manslaughter, a defendant is entitled to the involuntary manslaughter instruction. Defendant contends that evidence of his belief that the shot shell would not hurt a person, that the gun was usually kept unloaded, and that he did not know at the time of the shooting whether the gun was loaded or unloaded, was sufficient to require the giving of the involuntary manslaughter instruction.

Section 9—3 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 9—3) provides, in part, that:

> "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly ***."

Section 4—6 of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 4—6) provides, in part, that:

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation ***."

Involuntary manslaughter is an offense which occurs without the intent to kill and where death results from acts which are recklessly performed. (*People v. Santiago* (1982), 108 Ill. App. 3d 787, 802, 439 N.E.2d 984.) Where there is credible evidence in the record which would reduce murder to manslaughter the defendant is entitled to a

manslaughter instruction. (*People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696.) "An involuntary manslaughter instruction, however, should not be given if there is no evidence which would reduce the crime to manslaughter." (101 Ill. 2d 443, 451, 463 N.E.2d 696.) Thus, the question here is whether there is credible evidence in the record to support a finding that defendant acted, not with the intent to kill Judith, but recklessly, at the time he fired the fatal shot.

The essence of defendant's testimony of the shooting is that he became angered by Judith's insults and intentionally broke or destroyed several things. The last thing he broke was a plant pot. He does not remember anything from the time he broke the pot until he heard the gunshot and saw his wife falling.

■ While defendant testified that he did not remember anything from the breaking of the pot to hearing the gunshot, he also testified that he did not intend to kill Judith. Defendant's mere statement that he did not intend to kill the victim does not provide a sufficient basis to warrant giving an involuntary manslaughter instruction. (*People v. Cannon* (1971), 49 Ill. 2d 162, 166, 273 N.E.2d 829; *People v. Harris* (1980), 90 Ill. App. 3d 703, 705, 413 N.E.2d 499.) His conduct just prior to the shooting and the uncontroverted testimony that he pointed the gun at Judith and shot her at close range negates any suggestion of recklessness. Thus, some other evidence supporting a finding of recklessness, as opposed to intent to kill, must be present to warrant an involuntary manslaughter instruction under the evidence here.

■ A defendant is entitled to an instruction on any defense shown by the entire evidence, even if the facts on which the defense is based are inconsistent with the defendant's own testimony. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540, 349 N.E.2d 31.) While very slight evidence upon a given theory justifies giving an instruction (63 Ill. 2d 534, 540, 349 N.E.2d 31), the " 'very slight evidence' " test does establish a minimum standard to be met before instructions are required. (*People v. Baggett* (1983), 115 Ill. App. 3d 924, 931, 450 N.E.2d 913.) If this minimum standard were not required, it would allow "a defendant to demand unlimited instructions, which are wholly unrelated to the case but are based upon the merest factual reference or witness's comment." *People v. Bratcher* (1976), 63 Ill. 2d 534, 540-41, 349 N.E.2d 31; *People v. Baggett* (1983), 115 Ill. App. 3d 924, 931, 450 N.E.2d 913.

■ Here, there is some evidence generally that defendant believed the shot shell would not hurt a person and that Judith, at some times, had kept the gun unloaded. However, there is no testi-

mony by defendant or anyone else that this evidence had any bearing on defendant's state of mind at the time of the shooting. The thrust of defendant's trial testimony is that he does not recall what occurred at the time the gun was fired. The last thing he remembered was throwing the flower pot to the floor. He did not remember getting the gun or shooting his wife. This testimony does not advance his theory of recklessness. (*People v. Boisvert* (1975), 27 Ill. App. 3d 35, 41, 325 N.E.2d 644.) The record shows that defendant pointed the gun at Judith from a distance of about one foot, said "I will blow your brains out," and fired the fatal shot. This evidence strongly indicates an intent to kill. (See *People v. Cannon* (1971), 49 Ill. 2d 162, 166, 273 N.E.2d 829; *People v. Panzer* (1979), 73 Ill. App. 3d 1, 7, 391 N.E.2d 467.) No evidence was presented which tended to show that defendant, at the time he fired the fatal shot, believed the gun was unloaded or that it would not harm Judith if he shot her. Any inference that defendant held such beliefs would be based on speculation rather than credible evidence in the record. Because of the absence of any credible evidence in the record which would reduce murder to involuntary manslaughter, the trial court did not err in refusing to give defendant's tendered involuntary manslaughter instruction. See *People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.

Defendant also contends that the trial court erred in allowing the prosecutor to cross-examine him about his failure to cooperate with the State-appointed psychiatrist. Defendant maintains this violated his constitutional privilege against self-incrimination because he was under "no statutory or constitutional requirement to submit to the court-appointed examination ***." Originally, defendant had given notice of the defense of insanity, and the trial court on motion of the State pursuant to section 115—6 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 115—6) had appointed a psychiatrist named by the State to examine defendant. Defendant later refused to submit to this examination. Prior to trial, however, defendant indicated the defense of insanity would not be used at trial and no such evidence was introduced by him. Defendant did introduce expert medical opinion evidence that he acted under a sudden and intense passion resulting from a serious provocation.

■ ■ Assuming this cross-examination was erroneous, because defendant did not rely upon the defense of insanity at trial, or for any of the other reasons advanced by defendant on appeal, and assuming such error was a constitutional violation, we hold that it was harmless beyond a reasonable doubt and, therefore, does not require

reversal. In order to hold a constitutional error harmless, "the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman v. California* (1967), 386 U.S. 18, 24, 17 L. Ed. 2d 705, 711, 87 S. Ct. 824, 828; *People v. Spicer* (1979), 79 Ill. 2d 173, 183, 402 N.E.2d 169.) The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. (*Chapman v. California* (1967), 386 U.S. 18, 23, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827-28; *People v. Knippenberg* (1977), 66 Ill. 2d 276, 287, 362 N.E.2d 681.) No such possibility exists here.

It is undisputed that defendant shot and killed his wife. The only question raised was whether the killing was done under a sudden and intense passion resulting from serious provocation so as to reduce the offense from murder to voluntary manslaughter (Ill. Rev. Stat. 1981, ch. 38, par. 9—2). The jury heard the testimony of two eyewitnesses and defendant as to the events leading up to the shooting. The jury also heard testimony for defendant by Dr. Rossiter, a psychiatrist, and Dr. Ostrov, a psychologist, that in their opinions defendant acted under a sudden and intense passion resulting from serious provocation. In light of all this evidence, defendant's refusal, on advice of counsel, to talk with the State-appointed psychiatrist could have had no impact on the jury's finding of murder. While we do not rule on the propriety of admission of such expert testimony for the defense, we hold that any possible adverse effect on defendant's case, because the jury learned he talked with Dr. Rossiter and not with the State's psychiatrist, is obviated by the fact that Dr. Ostrov rendered his opinion based on a hypothetical, without having talked with defendant. Since defendant had expert testimony supporting his theory of the case, which was developed apart from any examination of defendant, the jury could not have discounted Dr. Ostrov's testimony merely because defendant did not cooperate with the State's psychiatrist while talking with Dr. Rossiter. Under the facts here, we find the limited cross-examination disclosing defendant's failure to talk with the State's psychiatrist did not contribute to defendant's conviction. Thus, reversal is not required.

■ Defendant's third issue on appeal is whether the trial court erred in allowing the State to ask certain other questions on cross-examination. This issue is divided into three subissues. The first subissue deals with questions asked of defendant concerning his conversations with police officers concerning the events of the evening of the shooting and the failure of the State to complete impeachment of defendant with independent evidence. Defendant cites several ex-

cerpts from the record in which defendant is asked about statements he allegedly did or did not make. However, at no point did defendant move to have the questions or answers stricken. While he cites two places in the record where he claims to have objected to these questions, the record discloses that one of these objections was unrelated to this point and the other gives no basis for the objection. Failure to object to improper evidence or to move to strike it after its admission, giving specific reasons for the objection or motion to strike, constitutes a waiver of the error. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 98, 136 N.E.2d 817; *People v. Sebag* (1982), 110 Ill. App. 3d 821, 824, 443 N.E.2d 25.) Thus, defendant has waived any error concerning the State's questioning him about things he did or did not tell police officers after his arrest.

The second subissue concerns the prosecutor's questioning of defendant about the differences between his testimony and the testimony of Toni and Hector Rodriquez. While it has been held to be improper to attempt to force a defendant to judge the veracity of a witness (*People v. Hopkins* (1982), 107 Ill. App. 3d 422, 426, 437 N.E.2d 722), defendant has failed to raise this issue in a post-trial motion, and therefore, has waived any error. (*People v. Lucas* (1981), 88 Ill. 2d 245, 250, 430 N.E.2d 1091.) Even if we were to consider the issue, it is clear that in all but one of the instances cited by defendant, the prosecutor did not ask defendant about the veracity of the other witnesses' testimony. In the one instance where he did, defendant's objection to the question was sustained before defendant answered. Thus, no prejudicial error occurred.

The third subissue defendant raises is that the trial court erred in allowing defendant to be recalled for cross-examination and in allowing defendant and Robert Burton to be cross-examined about prior statements, without the State's properly completing impeachment.

■ Whether to allow a witness to be recalled is generally a question within the sound discretion of the trial court. (*People v. Harris* (1979), 74 Ill. 2d 472, 477, 386 N.E.2d 60; *People v. Kissinger* (1983), 116 Ill. App. 3d 826, 832, 452 N.E.2d 615.) Other jurisdictions have applied this standard to the recall of a criminal defendant for further cross-examination. (*E.g., State v. McKissic* (Mo. 1962), 358 S.W.2d 1, 5; *Mize v. State* (1979), 152 Ga. App. 190, 192-93, 262 S.E.2d 492, 494.) We believe this is the proper standard governing the recall of a criminal defendant for further cross-examination, and thus hold that the decision of the trial court on whether to allow a defendant to be recalled for further cross-examination should not be disturbed absent

an abuse of discretion. At the time defendant objected to his recall, he did not offer any basis for finding that he would be prejudiced by the recall. His only objection was that evidence (a tape recording of police communications) had been introduced by defendant after he left the stand and prior to the State's request to recall him. The State represented that its additional questions of defendant would be unrelated to the tape recording and were merely questions the State forgot to ask defendant previously. The questions actually asked were unrelated to the tape recording. On this record, defendant has failed to demonstrate that the trial court abused its discretion in allowing the State to recall defendant for further cross-examination. See *People v. Kissinger* (1983), 116 Ill. App. 3d 826, 832-33, 452 N.E.2d 615.

■■ Defendant contends that the questions asked of him when he was recalled "were clearly objectionable, and constituted error when the State failed to call either Mr. Vera or Mr. Emmerson [*sic*] to testify." The questions asked defendant were whether, about a month prior to the shooting, he had told Vera that he would dent Judith's faceplate in and told Emerson previous to the shooting that he would blow Judith's brains away. Defendant denied making these statements. Defendant similarly maintains that it was error to ask defense witness Robert Burton whether he had ever heard defendant say he would blow Judith's brains away and whether Burton had ever told Emerson or Vera that he had heard defendant make such a statement. Burton denied these things. Defendant argues these questions and answers constitute error because the State failed to complete the impeachment of Burton by calling Vera or Emerson.

The record shows that defendant did not move to strike the testimony of defendant or Burton or the prosecutor's questions relating to the alleged statements of defendant and Burton noted above. While defendant objected to defendant being recalled as a witness and objected to a question asked of Burton as being beyond the scope of direct, he never moved to strike the questions and answers at the conclusion of the State's rebuttal evidence upon the failure of the State to call Vera and Emerson to complete the impeachment. Failure to make a motion to strike waivers any error. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 98, 136 N.E.2d 817; *People v. Sebag* (1982), 110 Ill. App. 3d 821, 824, 443 N.E.2d 25.) While defendant did move for a mistrial during trial on the basis that Emerson had been in the courtroom and, therefore, could not be called to complete the impeachment, such a motion does not relieve defendant of the duty to make a motion to strike. (*People v. Moore* (1979), 73 Ill. App. 3d 510, 519, 392 N.E.2d 64.) Additionally, the mistrial motion did not encom-

pass the statement defendant allegedly made to Vera nor Burton's testimony. Thus, defendant has waived any error.

Where the evidence is closely balanced, or the error of such a magnitude that its commission denies the accused a fair trial, a court of review will grant relief if the trial error is so prejudicial that real justice has been denied or the verdict of the jury may have resulted from such error. (*People v. Yates* (1983), 98 Ill. 2d 502, 533, 456 N.E.2d 1369; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77, 404 N.E.2d 233.) This is the plain-error rule, which is a limited exception to the waiver doctrine. (79 Ill. 2d 564, 577-78, 404 N.E.2d 233.) While it is elementary that the cross-examiner must offer evidence that a prior inconsistent statement was in fact made by the witness, where on cross-examination the witness is asked about such a statement and denied having made it (*People v. Moore* (1973), 54 Ill. 2d 33, 37-38, 294 N.E.2d 297), we do not believe the error in failing to properly complete the impeachment rises to the level of plain error.

The evidence here is not closely balanced, nor did the error deny defendant a fair trial. The evidence presented, particularly the testimony of Toni and Hector Rodriguez, establishes that defendant intentionally fired a pistol at Judith from point-blank range. The defense presented was voluntary manslaughter. The evidence shows that an argument between Judith and defendant precipitated the shooting. The real issue was whether there was serious provocation warranting a reduction to voluntary manslaughter. The State did not in its closing arguments mention these prior statements or contend that defendant had considered killing Judith at any time prior to the events that evening. We do not believe the error involved was so prejudicial that defendant was denied real justice or that the verdict of the jury may have resulted from the error. (See *People v. Yates* (1983), 98 Ill. 2d 502, 533, 456 N.E.2d 1369.) Thus, no plain error was committed which requires reversal.

For the foregoing reasons the judgment of the circuit court of Kane County is affirmed.

Affirmed.

SEIDENFELD, P.J., and HOPF, J., concur.