THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LAWRENCE PRICE, Defendant-Appellant.

First District (3rd Division)   No. 86—2039

Opinion filed November 16, 1988.

Paul P. Biebel, Jr., Public Defender, of Chicago (Mark Stein, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Kim A. Novi, and Marilyn F. Schlesinger, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Lawrence Price, was charged by information with six counts of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) and three counts of aggravated arson (Ill. Rev. Stat. 1983, ch. 38, par. 20—1.1). After a jury trial, defendant was found guilty on all counts and sentenced to natural life imprisonment for the murder convictions and 30 years' imprisonment for aggravated arson. Defendant appeals and raises the following contentions: (1) the trial court's refusal to give a tendered involuntary manslaughter instruction denied defendant a fair trial; (2) the aggravated arson conviction cannot stand, since the aggravated arson statute under which defendant was convicted is unconstitutional; (3) the giving of an opinion by a State's expert as to an ultimate issue in the case constituted reversible error; and (4) photographs sent to the jury had no probative value and unduly prejudiced defendant.

For the reasons stated below, we affirm the murder conviction and sentence and vacate the conviction and sentence for aggravated arson.

At trial a number of witnesses testified on behalf of the State. Their testimony indicated the following. On August 9, 1984, defendant lived at 16142 Plymouth Court in Markham, Illinois, along with his wife, Cora Price, and Cora's children, Joseph, Jori, Stacy, Marlene, and Darlene. Also living in the home was defendant's son, Lawrence Price, Jr. Two of defendant's grandchildren, Sequanna and Leiman Davis, were visiting from Detroit. Cora's mother, Juanita Young, was also present, in addition to a cousin, Eric. On that date, defendant arrived home from work around 3 p.m. Later that afternoon or evening, defendant began arguing with some of the family members.

Defendant argued with Stacy about her failure to help clean the kitchen. Stacy testified that defendant told her that she read the "goddamned Bible" too much and should not go to her church anymore. Defendant also told Stacy that the best thing her natural father ever did for her was to die. Stacy replied that the best thing defendant's mother ever did was to die. According to Lawrence Price, Jr., who heard the conversation between Stacy and defendant, defendant then slapped Stacy. Stacy left the house crying and went next door to a neighbor's house.

Defendant also accused Lawrence, Jr., of lying about vacuuming one of the rooms of the house. Defendant then scolded Lawrence, Jr., for whipping three-year-old Sequanna for wetting the bed. Defendant stated that Lawrence, Jr., should not whip the other children. Lawrence, Jr., replied that Sequanna's mother authorized Lawrence, Jr., to whip the child if she wet her pants. Defendant hit Lawrence, Jr., with his hand, and Lawrence, Jr., left the house and sat on the porch. Defendant came out to the porch some time later and told Lawrence, Jr., that he did not have to come back, and that if he did not abide by defendant's rules, he could live somewhere else. Lawrence, Jr., stated that the next-door neighbors told defendant to let Lawrence, Jr., back into the house. Lawrence, Jr., stated that defendant replied that before he would let Lawrence, Jr., back into the house, he would "burn it down first."

Cora came home from work about 12:45 a.m. Cora and defendant began arguing about the events that occurred between defendant and the children earlier in the evening. Defendant stated and repeated several times that Cora and the children were not going to sleep in the house that night, and defendant demanded that Cora and the children leave. Around 1 a.m., Cora called the police. Officers William Barron and Richard Dearman arrived, talked to defendant, and told the children to go to bed. The police told defendant that if they had to

return that night, they would jail him.

After the police left, defendant again demanded that the family leave the house. Stacy testified that defendant went into her bedroom and shook her mattress and overturned the dressers. Later, Stacy joined Cora, Marlene, Darlene, Sequanna, and Leiman in Cora's bed and watched television. Defendant entered Cora's room and again stated that no one would sleep in the house that night. Defendant shook the mattress and pulled the television cord from the electrical outlet in the wall.

Cora and Lawrence, Jr., then saw defendant pack some things in a garment bag and leave the house. The children in Cora's bed fell asleep. Cora went down to the living room and lay on the couch. About 20 to 30 minutes later, Cora heard defendant ask the next-door neighbor for a gas can, "the big gas can." Cora testified that after defendant left again, she stated to the neighbor that she did not believe that defendant would burn down the house and the neighbor agreed.

A short time later, Cora heard the back door of the house slam and she then went into the kitchen. She saw defendant pouring gasoline onto the floor from a can. Cora asked defendant what he was doing. Cora stated that defendant replied, "I am going to burn all you mother fuckers up." Cora headed toward the front door of the house and saw defendant was then in the flower room. As she ran out the front door, Cora yelled to the children to flee. Once Cora was outside, she saw smoke and fire coming from the house. Cora continued to yell to the children after she was outside. She also threw a brick through a bedroom window in order to wake the children. Cora saw defendant driving his car out of the driveway and heading down the street.

Dr. Robert Stein, chief medical examiner of Cook County, testified that he performed autopsies on the bodies of the victims. Stein gave his opinion that the children died of acute carbon monoxide poisoning. Stein also stated that the children's bodies were badly charred, with third-degree burns.

Betty Davis, the mother of the victims, was notified of the children's deaths. She then traveled to Chicago, where she identified her children at the medical examiner's office. Davis, Stein, and two fire fighters also identified the victims at trial from photographs.

Fire investigator Daniel Buchanic testified that he investigated the scene of the fire on August 10, 1984. Buchanic observed that the burn patterns were uneven and concluded that there was a poured liquid solvent in the area near the sun room, kitchen, dining room, and family room. He stated that the fire generated "an extremely intense

heat in an irregular manner." He stated that an accelerant had been used and that once ignited, the fire spread very rapidly. The burn patterns on the kitchen appliances did not indicate that a pilot light started the fire. Buchanic stated that the fire began at an exit area of one of the rooms near the kitchen. Buchanic gave his opinion that the fire was purposely set.

Defendant was arrested on August 10, 1984. After his arrest, Officer Dearman asked defendant whether he knew that two babies were burned and died in the fire. Officer Bronell, who was present for the conversation between Dearman and defendant, testified that defendant responded by saying, "I don't give a fuck."

Assistant State's Attorney Daniel Darcy testified that he questioned defendant regarding the incident in the presence of a court reporter. In his statement, defendant stated that he and his wife argued that evening. Later, defendant left the house, got a five-gallon gasoline can and bought $5 worth of gasoline and some cigarettes. He returned home, poured some of the gasoline into a bucket, and began to pour the gasoline from the bucket, spreading the gasoline around the house. Defendant stated that when he reached the kitchen, the gasoline exploded. Defendant denied lighting the gasoline. He stated, "I guess I was going to ignite it, but I never got a chance to do it." Defendant was burned on his arm, then he dropped the "can" (as he later referred to the container he used) and fled the house. Defendant got into his car and drove to a store for cream for his arm. Defendant stated that he was aware that "everybody" was home at the time, eight or nine people, and he thought everyone was awake.

At trial defendant testified that he had argued with some of the family members in the early evening. He believed that he was not getting respect from the children. Defendant denied that he turned over dressers in Stacy's room. Defendant stated that before the fire, he told Cora, "I'm going to burn this mother fucker down." When the police arrived at the home in response to Cora's call, defendant asked the police to get the family out of the house. Defendant stated that he packed a small bag with clothes, left the house, and got the gas can from the next-door neighbor. Defendant testified that he did not intend to harm the children and that he had spent too much time and money remodeling the house to destroy it. Defendant stated that Cora saw him sprinkle the gasoline around the house. Defendant did not tell the children that he was spreading the gasoline in the house. He did not believe the gasoline would ignite.

At an instruction conference at the close of trial, the trial court denied the defense's request that an instruction for involuntary man-

slaughter be sent to the jury. After convicting defendant of aggravated arson and murder, the jury was asked to consider the imposition of the death penalty. The jury did not unanimously agree that defendant was eligible for the death penalty. The trial court sentenced defendant to natural life imprisonment for murder and 30 years' imprisonment for aggravated arson.

On appeal defendant initially contends that the trial court's refusal to give the tendered involuntary manslaughter instruction denied defendant a fair trial, since there was evidence to support such an instruction.

■ When there is evidence in the record which, if believed by the jury, would reduce the crime of murder to manslaughter, an instruction defining manslaughter should be given. (*People v. Foster* (1987), 119 Ill. 2d 69, 87, 518 N.E.2d 82, *cert. denied* (1988), ____ U.S. ____, 100 L. Ed. 2d 628, 108 S Ct. 2044, *reh'g denied* (1988), ____ U.S. ____, 101 L. Ed. 2d 957, 109 S. Ct. 5.) An involuntary manslaughter instruction should not be given, however, where the evidence clearly shows that the offense was murder. *Foster*, 119 Ill. 2d at 87, citing *People v. Simpson* (1978), 74 Ill. 2d 497, 501, 384 N.E.2d 373; *People v. Sanders* (1974), 56 Ill. 2d 241, 253, 306 N.E.2d 865, *cert. denied* (1973), 417 U.S. 972, 41 L. Ed. 2d 1143, 94 S. Ct. 3178.

■ Involuntary manslaughter and murder require different mental states. A conviction for involuntary manslaughter requires sufficient evidence to indicate that the acts committed by the defendant which cause the death are those that are likely to cause death or great bodily harm, *and the defendant performs them recklessly.* (Ill. Rev. Stat. 1983, ch. 38, par. 9—3.) A person acts recklessly when "he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Ill. Rev. Stat. 1983, ch. 38, par. 4—6.) A conviction for murder requires sufficient evidence to show that in performing the acts which cause the death, the defendant intends to kill or do great bodily harm or knows that such acts will cause death, or knows that such acts create a strong probability of death or great bodily harm. Ill. Rev. Stat. 1983, ch. 38, par. 9—1.

■ The evidence in the instant case is sufficient to indicate that defendant had the requisite mental state to be convicted of murder. We must determine whether there is sufficient evidence also to support a conviction for involuntary manslaughter. That is, whether the evidence is sufficient to indicate that defendant recklessly performed

such acts causing death as were likely to cause death or great bodily harm.

Defendant cites *People v. Farmer* (1977), 50 Ill. App. 3d 111, 116, 365 N.E.2d 177, 180, where the court stated:

> "[I]f there is any evidence in the record, no matter how weak or inconsistent with the rest of the record, the jury should be given the instruction on the lesser offense. It all boils down to a matter of credibility—will the jury believe defendant's account of what happened? The court should not strip the jury of its traditional function."

The State cites *People v. Ishmael* (1984), 126 Ill. App. 3d 320, 466 N.E.2d 1334, in which the court stated that a defendant's mere statement that he did not intend to kill the victim did not provide a sufficient basis to warrant giving an involuntary manslaughter instruction. *Ishmael*, 126 Ill. App. 3d at 326, citing *People v. Cannon* (1971), 49 Ill. 2d 162, 166, 273 N.E.2d 829; *People v. Harris* (1980), 90 Ill. App. 3d 703, 705, 413 N.E.2d 499. See also *People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.

In the instant case, defendant stated that he did not intend to harm the children. Further, he testified that he had spent too much time and money remodeling the house to destroy it. In addition, he stated that he believed that the children were awake, in any event, apparently implying that he believed they would escape. Defendant argues on appeal that the evidence is sufficient to support a conviction for involuntary manslaughter.

Defendant's conduct before and after the fire, however, negates defendant's statements that he did not intend to harm the children or damage the house. (See *People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.) Before the fire, defendant stated, "I'm going to burn this mother fucker down." Cora testified that defendant stated, "I'm going to burn you mother fuckers up." Defendant admitted that after arguing with the family, he borrowed a large gas can from a neighbor, drove to a gas station and bought $5 worth of gasoline. He was aware that Cora, Juanita Young, and the children were at home when he began deliberately pouring gasoline throughout the house. He had stated earlier that he would burn down the house before he would let Lawrence, Jr., back inside.

Further, after the fire began, defendant failed to warn anyone in the house about the fire or smoke, and failed to contact police, the fire department, or a neighbor regarding the fire. Nor did defendant attempt to rescue any of the people in the house. Rather, he got into his car and left the scene.

We find that the evidence fails to support the contention that defendant acted recklessly in performing the actions which caused the deaths of the children. His statement that he did not intend to harm the children and the house is not sufficient to support an involuntary manslaughter instruction. See *People v. Ishmael* (1984), 126 Ill. App. 3d 320, 466 N.E.2d 1334.

■ Defendant next contends that his convictions for aggravated arson must be reversed since the aggravated arson statute under which he was convicted (Ill. Rev. Stat. 1983, ch. 38, par. 20−1.1(a)(1)) is unconstitutional. Defendant was convicted of one count of aggravated arson under subsection (1) of the statute (Ill. Rev. Stat. 1983, ch. 38, par. 20−1.1(a)(1)) and two counts of aggravated arson under subsection (2) of the statute (Ill. Rev. Stat. 1983, ch. 38, par. 20−1.1(a)(2)). The State concedes that the statute is unconstitutional under the reasoning of *People v. Johnson* (1986), 114 Ill. 2d 69, 499 N.E.2d 470, and *People v. Wick* (1985), 107 Ill. 2d 62, 64-65, 481 N.E.2d 676.

In *Johnson,* the supreme court held that subsection (1) of the statute (Ill. Rev. Stat. 1983, ch. 38, par. 20−1.1(a)(1)) is unconstitutional. In *Wick,* the supreme court earlier held that subsection (3) of the statute (Ill. Rev. Stat. 1983, ch. 38, par. 20−1.1(a)(3)) is unconstitutional. Subsection (2) of the statute (Ill. Rev. Stat. 1983, ch. 38, par. 20−1.1(a)(2)) was not directly at issue in *Johnson* or *Wick.* In *Johnson,* however, the court indicated that subsection (2) of the statute likewise is unconstitutional when it stated:

> "No doubt the legislature, in enacting section 20−1.1, intended to provide for an aggravated form of arson and intended the factors set out in subsections (1), (2) and (3) to enhance the offense from simple arson, a Class 2 felony, to aggravated arson, a Class X felony. However, in doing so it did not define an underlying offense." (*Johnson,* 114 Ill. 2d at 72.)

Therefore, we agree with the parties that both sections of the statute under which defendant was convicted (Ill. Rev. Stat. 1983, ch. 38, pars. 20−1.1(a)(1), (a)(2)) are unconstitutional. Therefore, defendant's conviction and sentence for aggravated arson cannot stand and must be vacated. *People v. Palmer* (1986), 141 Ill. App. 3d 234, 490 N.E.2d 154.

The State contends that vacating defendant's conviction for aggravated arson would not affect the natural life sentence. Since the record shows that the trial court was not influenced by the aggravated arson conviction in determining the natural life sentence for murder, a remandment of the matter for resentencing is unnecessary.

We agree with the State and hold that a remandment is unnecessary for the murder conviction.

■■ Defendant also contends that reversible error was committed when fire investigator Daniel Buchanic was allowed to testify as to the cause and origin of the fire, an ultimate issue in the case. Specifically, Buchanic testified that he believed that the fire was "ignited purposedly [*sic*]."

We agree with the State that defendant has waived this issue on appeal, since he failed to object at trial and failed to raise the issue in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Even assuming *arguendo* that defendant preserved the issue on appeal, we find that defendant's argument must fail in view of case law holding that experts may testify regarding an ultimate issue in a case. (See *Watson v. State Farm Fire & Casualty Co.* (1984), 122 Ill. App. 3d 559, 461 N.E.2d 57.) In *Merchants National Bank v. Elgin, Joliet & Eastern Ry., Inc.* (1971), 49 Ill. 2d 118, 273 N.E.2d 809, the supreme court stated that experts may testify as to ultimate issues since the jury is not required to accept the opinion and their responsibilities are not being usurped. *Merchants National Bank,* 49 Ill. 2d at 122.

Finally, defendant contends that photographs sent to the jury had no probative value and served only to prejudice the jury against him. Specifically, defendant objected to the admission into evidence of photographs which depicted the following: (1) the location of the children victims after the fire; (2) a more close-up picture of the children from the chest up after the fire; and (3) the children some time before the date of the fire.

■■ The admission into evidence of a photograph of a murder victim is within the discretion of the trial court, and when the photograph is relevant to establish some material fact, it is admissible despite its gruesome nature. (*People v. Garlick* (1977), 46 Ill. App. 3d 216, 360 N.E.2d 1121, *cert. denied* (1977), 434 U.S. 988, 54 L. Ed. 2d 484, 98 S. Ct. 620.) If the photograph could serve no purpose other than to inflame and prejudice the jury, and is not probative of any material issue in the case, then the photograph should not be admitted. *People v. Smith* (1972), 5 Ill. App. 3d 648, 283 N.E.2d 727.

■■ In the instant case, the trial court found that the two photographs showing where the children were found after the fire had probative value and "are not gruesome." The court found that the photographs of the children from the chest up have probative value regarding the cause of death and "some of the malevolence of this Defendant," and corroborate the testimony of the fire fighters, police

officers, and mother of the victims. Further, the court allowed into evidence, over objection by the defense, two photographs of the children as they appeared some time before the fire, to show the effects of the acts of defendant which caused their deaths.

We note that the trial court did not allow into evidence two full-length body photographs of the children, after finding that they were gruesome. We hold that with regard to the photographs that were admitted, the trial court properly exercised its discretion in determining that the photographs were not gruesome and were probative of material issues in the case.

For .the foregoing reasons, we affirm the defendant's conviction and sentence for murder and vacate the conviction and sentence for aggravated arson.

Judgment affirmed in part and vacated in part.

WHITE, P.J., and RIZZI, J., concur.