**People of the State of Illinois, Plaintiff-Appellee, v. Ralph R. Ruderson, Defendant-Appellant.**

Gen. No. 53,460.

First District, First Division.

February 26, 1970.

Rehearing denied December 3, 1970.

Washington, Kennon, Bryant & Hunter, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Robert B. McGee, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE BURMAN delivered the opinion of the court.

The defendant, Ralph R. Ruderson pleaded not guilty to the offenses of rape and robbery. After a jury trial, he was found guilty as charged and sentenced to ten to fifteen years in the penitentiary.

The defendant contends, on appeal, that there was insufficient evidence of identification and that his alibi showed him to be at a different location at the time of the attack on the prosecutrix. He argues that he was therefore not proven guilty beyond a reasonable doubt.

The complainant, Susan Beth Madura, was a single person who resided at 7801 South Hermitage with her parents. She attended Mundelein College and on August 2, 1967, was employed at Wesley Memorial Hospital as a diet clerk during summer vacation. About 6:12 a. m. on that date, she was walking east on 78th Street toward Ashland Avenue to get a bus. She observed a man walking toward her on the same side of the street. She

described him as a light-skinned negro, twenty to twenty-five years old, about five feet eleven and wearing a white shirt and dark pants. She testified that she recalled these features because she observed him the whole time he was walking toward her since it was rare for her to see anyone on the street at that time of the morning. The man whom she identified in court as the defendant, grabbed her about the mouth with his left hand and around the neck with his other hand. He forced her into an areaway entrance to a basement of an apartment building and demanded her money, watch and ring which she gave him. She had noticed the bottom band of a silver ring on the little finger of his left hand as he put his hand across her mouth. When he reached for her watch, she again noticed the ring which had a green stone set in it. The assailant forced her to remove her undergarments, then stuffed her underpants into her mouth, tied her slip around her eyes and mouth and tied her hands behind her back with her girdle. He then raped her twice, first from the rear and then with her on her back. She heard the lid of a garbage can fall, and her assailant then fled. She screamed that she had been attacked, and a couple took her into their apartment. They called the police who arrived within four minutes. Upon their arrival, she described her assailant, as aforementioned.

Miss Madura was then taken to Billings Hospital. While awaiting emergency treatment, the police officers brought in a man and she said she told them, "that was the man." She testified that before the defendant got close to her she recognized his walk, his general appearance and his build. As he came closer, she said she recognized his face, his ring and his voice. She also said that he was wearing the same white shirt and dark pants which he had on when he attacked her. She testi-

fied that she described the pants as dark pants to the police because they were darker than the white shirt. Miss Madura identified pictures of bruises which she sustained in the attack. She also identified the man's ring in evidence as the one the defendant wore when he raped her and when she saw him at the hospital.

Peter Papason testified that he heard a scream about 6:25 a. m. on August 2, 1967, and found the prosecutrix very disheveled and dirty with her hands tied behind her back. He called the police and they arrived within five minutes. His wife, Mary Papason, helped the prosecutrix clean herself.

Officer Alphonso Howard testified that he received a radio call about 6:27 a. m. concerning the incident and arrived at the Papason apartment about 6:30 a. m. The police sergeant who was already there, gave him the description of the assailant which he put on the police radio about 6:32 a. m. He then took the girl to Billings Hospital.

Officer James Shaver testified that between 6:00 a. m. and 6:30 a. m. he issued a ticket at 745 West 78th Street to a red truck parked in a residential area. With him was his partner, Officer Kush. This was about eight regular blocks from the Papason apartment. It took Officer Shaver approximately three to five minutes to write the ticket and put it on the windshield. He testified that he didn't see anyone else on the street as he was ticketing the car. The time marked on the ticket was 6:20 a. m. Officer Shaver explained that this was only an estimate and meant that he wrote the ticket after 6:00 a. m. and probably before 6:30 a. m. As he returned to the car after writing the ticket, a radio call informed him that a woman was calling for help at 1617 West 78th Street. As the officers proceeded to the scene, Officer Shaver observed three male negroes between Aberdeen, 1100 West and May, 1134 West 78th

274

Street. Officer Shaver stated that this was about six short blocks from the scene of the crime. After ascertaining that they were not fighting, the officers proceeded toward the scene of the crime. Before they reached their destination, they received another radio call, about 6:35 or 6:40 a. m., describing the girl's attacker as being a lightly complected negro, wearing a white shirt with dark pants, and his age and size. Officer Shaver said that this description was similar to one of the three individuals he had just seen, and he turned back to try to find him, but was unsuccessful. At the police station, about 8:00 a. m., he was informed that the defendant who was in custody had said that he saw Officer Shaver writing a ticket on a red truck at 78th and Halsted. Officer Shaver identified the defendant as one of the three men he saw on his way to the Papason apartment.

Officer David Davidson testified that he was northbound on Ashland Avenue about ten blocks from the scene when he received the first radio call. As he arrived at the Papason apartment building about 6:30 a. m., he received the description of the assailant on the radio. Between 6:30 and 6:40 a. m., while searching for the attacker, he stopped the defendant at 77th and May. Officer Davidson testified that he stopped the defendant who was wearing a white shirt and darker colored pants, because he fit the general description of the girl's assailant. At first, the defendant told Officer Davidson that he was coming from work, but later said that he was unemployed and was coming from his girl friend's house and a restaurant at 79th and Vincennes. He had no identification on his person. Officer Davidson immediately took the defendant to Billings Hospital and asked Miss Madura if she could identify him. While he was about ten or fifteen feet from her, she said that she was not sure if this was the man. As the defend-

ant walked toward her, he played with a ring on the little finger of his left hand. The victim said, "that ring." When she said this, the defendant said something, and she then said, "the voice, the body, that's him." Officer Davidson at no time heard her say that this was not the man.

Detective William Boreczky testified that he interviewed Miss Madura at the Papason apartment. When he saw the defendant at the police station, he was wearing a white short sleeve shirt and pale blue pants. The defendant told the detective that he was five feet eleven and weighed one hundred sixty-five pounds. Miss Madura identified him again at the police station, but never saw him in a lineup. It was stipulated by the parties that if Doctor Rice testified he would state that his examination of Miss Madura showed her to have marks and bruises about her person and evidence of fresh bleeding from the posterior hymenal region of her vagina.

The defendant, Ralph R. Ruderson, denied ever seeing Miss Madura or attacking her. He testified that he was twenty-eight years old and lived with his mother at 7603 South May Street, which is about 1200 west. He said that when he left home at 9:00 p. m. on August 1, 1967, he was wearing a white nylon shirt, pale blue pants and high top orange-yellow work boots. This was corroborated by his mother who also said that when she saw him at the police station the next day, his clothes were clean. After frequenting several taverns, the defendant went to the Paradise Restaurant at 402 W. 79th Place about 3:00 a. m. on August 2nd, and remained there until 6:00 a. m. Pearline Byers, a waitress at this restaurant, testified that the defendant was in the restaurant during that time. The defendant said that after leaving the restaurant he walked to 79th and Normal to meet his foreman who he thought would pick him up to go to a landscaping job. This was at 6:05 a. m. When

his foreman didn't come, he decided to walk home because he had no carfare. He said he stopped to talk to Mrs. Madeline Barrow at 7733 South Fielding, about 6:05 a. m., and stayed there about fifteen or twenty minutes, which was corroborated by the testimony of Mrs. Barrow. The defendant then walked west on 78th Street. He said that when he was near Halsted Street, he saw a negro police officer across the street writing a ticket for a red panel truck. He continued on across Halsted, and when he got east of Morgan on 78th, he saw two men walking along the street. He gestured to them and then saw a police car drive by them. When the defendant got near his home, after walking about fifteen or twenty short blocks, he was stopped by a police officer. The officer took him to Billings Hospital to be shown to the complainant. The defendant said that when he got within five or ten feet of her she was asked if she could identify him and she said, "no, this is not the man." He said that he was nervous and was playing with his ring, and the girl said, "that ring." He said he asked her what about the ring, and she said, "that voice, that voice," and then, "that's him." At the police station he told the arresting officer that he had seen a negro police officer writing a ticket on a red truck at 78th and Halsted about the time he was charged with having committed the rape.

The defendant contends that the identification by the prosecutrix was insufficient to establish him as her assailant. He argues that she admits she had never seen her assailant before and that she had only a short opportunity to observe him. It is contended that the description she gave the police was a very general one which did not match the defendant in several respects. ▮▮▮ We think the identification of the defendant by the prosecutrix was clear and convincing enough to support his conviction. She first observed the defend-

ant walking toward her on the same side of the street on a sunny morning. She watched him for the time it took her to walk half a block. Miss Madura said that she paid particular attention to the defendant because it was rare for her to see another person on the street at that time of the morning. During the attack she saw his ring and when her slip came loose over her face she saw his face again. When the defendant was shown to her at the hospital within an hour after the rape, the victim recognized "his walk," "his general appearance," "his build," "his face," "his voice" and defendant's ring. Her identification was unhurried, but positive. Only the defendant testified that she ever said he was not the man. The description she gave the police was complete enough to cause Officer Shaver, after he heard it, to return to look for the defendant whom he had seen with two other men and to cause Officer Davidson to stop the defendant and take him to see the victim. Precise accuracy in describing facial characteristics is unnecessary where an identification is positive. People v. Miller, 30 Ill2d 110, 113, 195 NE2d 694, 696. We find the identification in this case to be positive and unshaken and therefore sufficient to sustain defendant's conviction. The defendant argues that the evidence showed him to be in a different location at the time of the occurrence. This argument was made to the jury and to the trial judge on defendant's motion for a directed verdict and in post-trial motions and they rejected it. It must be remembered that the times involved were approximate and the area in question relatively small. The assailant ran from the scene, and we cannot say how fast the defendant could have run from one place to another. This was for the jury. It should also be noted that Officer Shaver said that he did not see the defendant while he was writing the ticket even though the defendant claimed to have walked by on

the other side of the street at that time. The jury was not required to believe the testimony concerning the defendant's alibi. People v. Harrison, 25 Ill2d 407, 411, 185 NE2d 244, 246.

Much reliance is placed on People v. Gardner, 35 Ill 2d 564, 221 NE2d 232, which the defendant argues is strikingly similar to the alibi testimony in the case at bar. We disagree. In Gardner the description of the assailant given to the police immediately after the crime, differed in significant respects from the victim's testimony at the trial and from the defendant's appearance at the time of his arrest shortly after the occurrence. In the case at bar the description given to the police by the victim was the same as that to which she testified at the trial. In Gardner the identification was considered weak while in the instant case the identification is positive, credible, certain and unshaken. The victim in Gardner identified the defendant mainly by his clothing while in this case the victim recognized his face, his walk, his voice, his build and his ring. Based on the entire record, we are convinced that the defendant was proven guilty beyond a reasonable doubt.

The judgment of the Circuit Court is therefore affirmed.

Affirmed.

MURPHY and ADESKO, JJ., concur.