People of the State of Illinois, Plaintiff-Appellee, v. Emmett Sanders, Defendant-Appellant.

Gen. No. 69–5.

Third District.

October 9, 1970.

Rehearing denied December 1, 1970.

Jack Vieley, of Peoria, for appellant.

Robert S. Calkins, State's Attorney of Peoria County, of Peoria, for appellee.

RYAN, P. J.

In a trial by jury, the defendant was convicted of armed robbery and sentenced to eight to twenty years in the state penitentiary. He contends that he was not afforded a fair and impartial trial as guaranteed by the United States Constitution because his conviction rested solely on the testimony of an alleged accomplice who received lenient treatment and who was impeached; that the conviction cannot be sustained where the only support for it is the uncorroborated testimony of an alleged accomplice which is contradicted by the testimony of other witnesses; and that the evidence does not prove his guilt beyond a reasonable doubt. As to the sentence itself, defendant contends that he received a heavier sentence than his alleged accomplice because he elected to be tried by a jury.

Prior to the trial of the defendant in this case, his alleged accomplice, one Thomas, pleaded guilty to armed robbery and was sentenced to two to four years in the penitentiary. Thomas testified in behalf of the People at defendant's trial.

There is no dispute about the following facts: On the night of May 31, 1968, Thomas and the defendant were playing in a dance band at a place called the Peppermint Lounge. In the early morning hours of June 1st, Thomas and the defendant left the Peppermint Lounge

445

in the company of two females and the defendant's brother. Prior to leaving, Thomas took a .38-calibre pistol from behind the bar and took it with him. They left in a 1967 gold Chevrolet automobile which belonged to a person identified as "Big Brother" for the purpose of getting some food for the owner of the establishment. The defendant drove. He drove the car up in an alleyway which was near, but not on the premises of the Martin Service Station. He stopped the car. Thomas got out of the car, went to the service station, showed the attendant the gun and told him it was a stickup. The attendant gave Thomas some money and he returned to the car after making the attendant lie on the floor. After Thomas returned to the car, the defendant drove away. After driving away, Thomas gave the female, Lorraine King, some money which she placed in her brassiere. The defendant then drove the car to a "friend's house" who was not at home. As they proceeded back to the car, they saw the police coming. One of them hid the gun in a Cadillac which was parked on the premises. They got back in the car and the defendant drove the automobile 10 or 15 yards up an alley before the police stopped them. Previously, however, and shortly after the defendant had driven away from the service station, a policeman noticed the attendant running from the station and stopped to investigate. Another person arrived on the scene and gave the officer certain information concerning the robbery that was transmitted over the police radio. Very shortly thereafter, another officer stopped the car being driven by the defendant which matched the description that had been put out over the police radio. In the stopped car were the defendant, Thomas, the two females and the defendant's brother. Yet another officer arrived on the scene where the car had been stopped. He observed that Lorraine King, one of the two females in the car, had a bulge in the middle of the front of her blouse. The officer asked her to hand

446

to him anything that she had concealed, and she gave him a roll of money.

All of the above uncontroverted facts were testified to by one or more of either Thomas in behalf of the People or the two females, and the defendant's brother in behalf of the defendant.

Thomas testified that at about 4:30 a. m. on the morning of the robbery, which was about five or ten minutes before the five persons left the Peppermint Lounge, the defendant asked him, "Did I want to go out and make some money." Thomas told him, "Yes." Later, as they proceeded down a street, the defendant asked Thomas, "Did I want to hit this gas station?" Thomas said, "Yes."

After the robbery, Thomas said to the defendant, "Let's go across the bridge over into East Peoria." The defendant stated he "knew a better place we would go, which would be over to his friend's house." The friend was not at home, and as they proceeded back to the car, they saw the police coming. The defendant asked Thomas for the gun and he hid it in a Cadillac parked on the premises. Thomas, continuing his testimony, then stated that while he and defendant were being taken to the police station in a police wagon, the defendant asked Thomas, "would I take the rap for him?"

The defendant did not take the stand to dispute Thomas' testimony. Defendant's case consisted of the testimony of the two female occupants of the car along with the defendant's brother. Their testimony controverted Thomas' testimony only to the effect that they stopped at the service station solely to purchase cigarettes; that it was Thomas who put the gun in the parked Cadillac; and that at no time was there any discussion in the car of committing any robbery.

Defendant stresses, however, that Thomas had given a written statement to the police taking sole responsibility for the robbery. Thomas later gave a second statement to the police which repudiated his first statement and

447

which differed from his testimony in court to the extent that he had the defendant handing him the gun after they were in the car.

■■ Defendant claims that Thomas was thoroughly impeached, by virtue of these two prior statements; that Thomas' testimony was uncorroborated; and that it was contradicted by the testimony of other witnesses. The jury and the trial judge felt otherwise and we concur with that finding. The issues raised by the conflict in testimony, such as it is, are factual in nature and properly within the province of the jury. It is the peculiar province of the jury to weigh the evidence and determine the facts, and a reviewing court will not reverse a judgment of conviction unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to justify our entertaining reasonable doubt as to defendant's guilt. People v. Lamphear, 6 Ill2d 346, 128 NE2d 892; People v. Todaro, 14 Ill2d 594, 153 NE2d 563.

■ It is erroneous to contend that the testimony of Thomas was uncorroborated. Much of what Thomas testified to, including virtually all of the circumstances of the crime, stands corroborated by the testimony of the defense witnesses and the entire factual picture. Thomas' repudiation of his first statement is explained by his testimony as to the conversation in the police wagon when the defendant asked Thomas, "would I take the rap for him?" The conflict between that portion of Thomas' second statement, that the defendant passed him the gun in the car and his actual testimony that Thomas took the gun with him, is one of those discrepancies which the jury had to weigh in considering Thomas' testimony, along with all of the other testimony and evidence of the case. There is no rule of law in such case that obliterates and renders useless the testimony of Thomas on this and all other matters simply because

448

his testimony is inconsistent in one respect with a signed statement. This is a question for the jury. The jury had a right to weigh the testimony of the other witnesses just as it had a right to weigh the testimony of Thomas.

We find one factual incident particularly impressive and that is that the defendant drove into an alley and parked off the premises of the service station. Thomas testified that the purpose for stopping was to commit a robbery. The defendant's witnesses would have the jury believe that the purpose for stopping was to purchase cigarettes. The factual scene, however, would cause one to believe Thomas since the reasonable approach to stopping at a service station for cigarettes would be to drive upon the premises and not stop off the premises in an alley, as was done in this case. Furthermore, the fact that Thomas came back with a roll of money and handed it to one of the females who put it in her brassiere rounds out the conclusion that they did not stop at the service station for the purchase of cigarettes.

■ In no sense, in this case, could it be said that the defendant's witnesses, either the two females or the defendant's brother, were disinterested. The decisions cited by the defendant with regard to the testimony of an accomplice being contradicted by disinterested witnesses would accordingly not apply. We believe that the guilt of the defendant was proven beyond a reasonable doubt.

■ Regarding the sentence, defendant contends that he received a heavier sentence than his accomplice because he elected to be tried by a jury and that Thomas had entered into an agreement with the State prior to the trial of the defendant whereby Thomas received a lenient sentence in exchange for his favorable testimony. There is not a scintilla of evidence in the record to support either of these contentions. Accordingly, the cases cited by the defendant simply have no application here. Defendant has arrived at this conclusion outside the

record merely on the basis of the fact that the defendant's sentence is more severe than Thomas' sentence. The mere difference in sentences is not sufficient to cause one to reach the conclusion reached by defendant. Other reasonable conclusions are equally supportable. Indeed, the record reveals that previous to the offense in question, Thomas had no criminal record. The defendant, on the other hand, had previously been convicted of armed robbery in 1964 and had been sentenced to a term of five to six years on that occasion.

■ Chapter 38, Ill Rev Stats, § 18–2 (1967), provides: "A person convicted of armed robbery shall be imprisoned in the penitentiary for any indeterminate term with a minimum of not less than two years." The sentence in this case of eight to twenty years was within the limits prescribed by law and proportionate to the offense. Considering defendant's past record, we cannot say that the trial court abused its discretion in the matter.

The judgment of the Circuit Court of Peoria County is accordingly affirmed.

Affirmed.

STOUDER and ALLOY, JJ., concur.