THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE SMITH, JR., Defendant-Appellant.

(No. 71-242;

Fifth District—May 23, 1972.

Gerald H. Johnson, of Cape Girardeau, Missouri, for appellant.

Peyton Berbling, State's Attorney, of Cairo, for the People.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

Following a trial to a jury, the defendant, Willie Smith, Jr., was convicted of murder and of attempt to murder. The trial had been removed to Massac County from Alexander County.

The defendant was sentenced to a term of from 60 years to 100 years on the murder conviction and to a term of from 15 to 20 years on the attempt to murder conviction. The sentences are to run consecutively.

The crimes occurred on the evening of February 17, 1969, in Cairo. Mary Alberta Magee, a woman in heir eighties, was in her home at 416—10th Street on that evening in the company of Olivia Paurom. Olivia Paurom was a roomer or boarder in the Magee home and a hospital technician exchange student from the Philippines. The two women were home alone watching television in the living room. At approximately 10:00 o'clock P.M. someone came to the door of the house and rang the doorbell. Mrs. Magee went to the door followed by Miss Paurom. Miss Paurom observed a man through a glass door. There was a light at the front door. Mrs. Magee unlocked the door and the man rushed in.

The Magee home faces south on 10th Street. The house was situated about half way between Washington Avenue, the main north-south street in Cairo, and Walnut. The house is on the north side of the east-west running Tenth Street. On the south side of Tenth Street facing Washington Avenue there is located the Mark Twain Restaurant. A back door to the restaurant is located on Tenth Street, a little less than half a block from the Magee house.

The entrance to the Magee home is on the west side of the house. From the entrance, there is a hallway which leads to stairs to the second floor. To the right of the entrance there is a sitting room and behind it to the north is another room which was used as a living room. There is a third room behind the living room. To the left of the third room is the kitchen; behind the kitchen is a small room that leads out to the back door. Miss Paurom and Mrs. Magee were watching TV in the middle room, the living room, when the intruder arrived at the front door.

When the intruder rushed in, Miss Paurom was near the front door at the door into the sitting room. Miss Paurom testified that after the man rushed in, she ran to the telephone and completed a call for help, but she did not know if she was understood. She testified, "I was beaten bad". She also testified that she got a good look at the assailant and also noticed how he was dressed. She could not tell his age. She did identify the defendant as the individual that came in the door and beat her. Upon cross-examination she again stated, "Yes, I am very sure that I could identify him because I saw him". She further stated that she had identified him from many pictures that had been shown her by the County officials.

Miss Paurom sustained severe injuries which indicated she had been beaten, including numerous fractures, lacerations and was suffering from concussion and shock, as reported by the attending physician. The physician also reported that at 12:15 the night of the crime he was unable to obtain blood pressure. Miss Paurom has blood type "O".

Near noon the following day, Mrs. Magee died from intercranial bleeding due to skull fracture according to the opinion of the physician treating at the time of death. A pathologist, who examined Mrs. Magee after death, also testified that in her opinion death was caused by hemorrhaging of the brain. The hemorrhaging was in turn caused by fracture of the skull. When the attending physician first examined Mrs. Magee, he found her unconscious with a four-inch wound on the left side of her scalp extending down to the bone, bleeding from the right ear and blood behind the left eardrum, her left eye lid swollen and discolored, her left pupil dilated. Mrs. Magee had blood type "A".

The Chief of Police of the City of Cairo and the Cairo Fire Chief, had entered the Mark Twain Restaurant shortly after 10:00 o'clock. The two were having a cup of coffee when Fire Chief Edwards noticed a lady come in the back door looking as though "she has been beaten". The lady, who was Miss Paurom, was bloody all over with blood on her head, face, clothes and matted in her hair. Fire Chief Edwards assisted Miss Paurom and Chief Clutts telephoned for help.

After help arrived and Miss Paurom was sent to the hospital, Chief Clutts and Fire Chief Edwards received notification from another officer that there was "someone" at 416 Tenth Street. Upon entering the Magee home, Chief Clutts found Mrs. Magee lying on the floor by the stairway unconscious in a pool of blood about the head. He once again telephoned for aid, summoning an ambulance.

After Mrs. Magee had been taken away in the ambulance, Chief Clutts went to the rear of the house and found blood around the kitchen telephone, which was partly torn down. In the kitchen, he saw bloody

tracks lead out the back door. There was snow on the ground in the back yard that had fallen prior to the 18th of February. He saw footprints and in the snow he found a metal object which he called part of a jack.

Chief Clutts then returned to the house to see if he could find any papers that might give him any "leads". He found a white envelope with blood spots on it addressed to Willie Smith, Jr., Clinton, Kentucky" and a return address of "Shirley Coates, 1106 Walnut, Cairo, Illinois". The envelope contained a valentine from Shirley Coates to the defendant. It was received into evidence as the defendant testified that he received it on the day of the murder, but asserted that he left it at Shirley Coates' house. Fire Chief Edwards also testified that there were two pocketbooks found that had no money in them.

Two police officers went to the home of Shirley Coates and from there to the defendant's grandparents' house, on 12th Street, where they met a Deputy Sheriff. They then went to 2104 Poplar where they were shown a picture of the defendant. From that residence, the officers went to the "Oasis", a lounge or tavern, where they found and arrested the defendant.

On or about February 18, 1969, the defendant gave a voluntary statement to the Chief Investigator for the Alexander County State's Attorney. In the statement, the defendant gave his explanation of his whereabouts on the day of the commission of the crimes. The defendant took the stand on his own behalf and testified as to his actions on the afternoon and evening in question. He testified that he did not visit the Magee home; he was the only witness for the defense.

When arrested he was wearing a tee shirt, blue knit pull-over or sweater, dark trousers and blue socks. He had with him a reversible trench coat. He was not wearing any underpants at the time of arrest. The Police did find a pair in the men's room of the "Oasis" tavern. The underpants were wet and had been recently washed. There was unclassified human blood found on the trench coat. The white tee shirt, and the socks had type "O" blood on them. The knit pull-over and trousers had type "A" blood. The defendant had type "O" blood. Early on the morning of the 18th, shortly after arrest, he was examined for possible injury or cuts from which he may have bled and there was none found. The defendant also stated to Chief Clutts that he didn't have any cuts or wounds.

About two days after the murder, Chief Clutts received an anonymous telephone call to look under a stump on 12th Street. The stump was located about two blocks from the Magee house. A bloodstained white shirt was found stuffed under the stump. The shirt was of a kind and

type that the defendant admitted wearing the day of the crimes. He stated he had taken it off, but did not recall where or when. The shirt contained a laundry mark, "C. E. Rob", which was identified as belonging to Clarence Robinson. Robinson testified, after being made the Court's witness, that he loaned the shirt to the defendant and that he had seen the defendant in the shirt on the day of the crime and the day before the crime. He was a friend of the defendant and lived with an aunt of the defendant. The blood on the shirt was type "O".

The defendant contends there was insufficient evidence to support the verdict; that the admission into evidence of certain of the People's exhibits was improper and prejudicial and, finally, that the defendant was not afforded due process of law and a fair trial under the Constitution of the United States and of the State of Illinois.

■■ In support of his first contention, the defendant asserts an alibi. He denied that he was at the Magee home, and in attempting to explain his whereabouts on the witness-stand and in his voluntary statement, made many conflicting statements. Ethel Coates, who resided with her sister, Shirley Coates, stated that he was not at their residence on the night in question after 9:00 o'clock in the evening. The defendant stated that he was with Ethel Coates that evening. We agree with the defendant that the prosecution has the burden of establishing beyond a reasonable doubt that the defendant committed the crime, (*People v. Wheeler*, 5 Ill.2d 474, 126 N.E.2d 228), and we further agree that if the defendant succeeds in sufficiently establishing his alibi so as to raise a reasonable doubt in the minds of the jury, the alibi is a complete defense to the charge. (*People v. Pearson*, 19 Ill.2d 609, 169 N.E.2d 252.) We cannot, however, say that the prosecution did not sufficiently refute the defendant's "alibi". The jury is not required to believe the defendant's alibi testimony, *People v. Ruderson*, 129 Ill.App.2d 271, 264 N.E.2d 27.

■■ Defendant further argues that the court erred because it overruled the motion for a directed verdict of "not guilty" upon the ground that the evidence was wholly insufficient to support the conviction of the crimes. The record has been reviewed and it would serve no purpose to restate the evidence that would allow the upholding of the jury's findings of guilt. It is within the peculiar province of the jury to weigh the evidence and determine the facts and unless that decision is so contrary to the evidence—so unreasonable, improbable or unsatisfactory so that we have reasonable doubt, the decision of the jury will not be disturbed. *People v. Sanders*, 129 Ill.App.2d 444, 263 N.E.2d 615.

The defendant next asserts that the court erred in admitting into evidence several of the People's exhibits. The defendant contends that

a photograph of the deceased victim was without proper foundation and was prejudicial to the defendant due to its gruesome and inflammatory nature.

■■ Dr. Yarbrough identified the photograph of the deceased, but was not present when it was taken. The photographer testified that he took the picture at the funeral home. Although he couldn't recall the exact date, he testified that it was taken the same night of the incident. The photographer further testified that the picture accurately portrayed the subject matter at the time it was taken. We find no merit in the defendant's assertion of lack of foundation.

■■■ As to the alleged prejudicial nature of the photographs, we note that they were introduced when the doctor attending the death testified, and his testimony concerned the nature, location and severity of the injuries of the decedent. The admissibility of photographs of a deceased depends upon whether the photograph was probative value such as aiding the jury in better understanding the medical testimony. (*People v. Jackson*, 9 Ill.2d 484, 138 N.E.2d 528; *People v. Ellison*, 121 Ill.App.2d 149, 257 N.E.2d 199.) While not aesthetically pleasing, it is not so gruesome or horrible as to necessarily be prejudicial. Admission, of course, is discretionary with the trial judge. (*People v. Myers*, 35 Ill.2d 311, 220 N.E.2d 297, *cert.* den., 385 U.S. 1019.) We have examined the photograph and cannot say that the trial court abused its discretion.

■■ The defendant also contends that certain photographs taken of the interior of the Magee home were introduced without proper foundation. The record refutes the defendant's argument. The photographer testified that they accurately portrayed the scene as did Chief Clutts. They served the function of assisting the jury in understanding the scene of the crimes, as explained by Miss Paurom, whose use of the English language was limited.

■■ The iron bar next is said by the defendant to have been erroneously admitted into evidence over his objection. The defendant asserts that there was no relevancy in the iron bar; that the bar was not sufficiently connected to the defendant and the crimes. We cannot agree with this assertion. The bar was found in the backyard at the end of a trail of bloody footprints. The bar had blood on it of a type to match the deceased. The evidence indicated the victims were beaten with a blunt instrument. The defendant was identified to be at the scene of the crime. The totality of this evidence sufficiently connected the weapon to the defendant to allow its admission. *People v. Jones*, 22 Ill.2d 592, 177 N.E.2d 112; *People v. Ashley*, 18 Ill.2d 272, 164 N.E.2d 70, *cert.* den., at 363 U.S. 815.

■■ Next, the defendant contends that the court erred in admitting

into evidence the white shirt with the blood stains on it. The defendant admitted wearing a similar-type shirt on the day of the crime, and his friend, Robinson, testified that he loaned the shirt to the defendant and that he had seen the defendant wear the shirt on the day of the crimes. Because the defense attorney stated the shirt was "ghastly looking" does not make the exhibit prejudicial to the defendant. Its admission was within the discretion of the trial court and no abuse of that discretion is found. (*People v. Jenko*, 410 Ill. 478, 102 N.E.2d 783.) We also conclude that the admission of the trousers was proper.

■■ Finally, the defendant asserts that the case should be reversed because he was denied a fair trial and due process of law. Upon a consideration of the complete record, we do not find any basis for this contention. (*Betts v. Brady*, 316 U.S. 455; *People v. Speck*, 41 Ill.2d 177, 242 N.E.2d 208.) The evidence to support the conviction is overwhelming. The conduct of the trial and the representation that the defendant had was of a high professional standard.

Judgment affirmed.

G. MORAN, P. J., and CREBS, J., concur.