2020 IL App (1st) 161632-U
No. 1-16-1632
Order filed March 31, 2020
Modified on rehearing June 1, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 2090 |
| | ) | |
| JAMAL SUGGS, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Griffin and Justice Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The State proved Jamal Suggs guilty of robbery and unlawful restraint beyond a reasonable doubt where the primary eyewitness provided a sufficiently reliable identification. The trial court improperly imposed a Class X sentence. We affirmed in part, vacated in part, and imposed a Class 2 sentence of seven years.

¶ 2    The trial court found Jamal Suggs guilty of robbery and unlawful restraint and imposed a 16-year sentence. The State's principal witness identified Suggs as one of three men who robbed a pharmacy. Suggs argues that his convictions rested entirely on this witness's dubious identification testimony. We disagree and affirm his conviction. While the robbery occurred

quickly and under highly stressful circumstances, the eyewitness had seen Suggs in the pharmacy every day for three days leading up to the robbery. The robber wore the same sweatshirt that Suggs wore to the pharmacy the day before the robbery and the same eyewitness identified Suggs in a photo array. Taking the evidence in the light most favorable to the State, as we must, we cannot say it was irrational for the trial court to find Suggs guilty.

¶ 3    Suggs also argues that the trial court improperly found him eligible for Class X sentencing based on his criminal history. Specifically, he argues that the trial court should not have considered his first predicate offense because, had he committed that offense at the time of this offense, he would have been adjudicated delinquent as a juvenile, not convicted as an adult. Following the reasoning of this court's recent decision in *People v. Miles*, 2020 IL App (1st) 180736, we agree. We vacate Suggs's Class X sentence and exercise our authority under Illinois Supreme Court Rule 615(b)(4) to impose a Class 2 sentence of seven years.

¶ 4                                Background

¶ 5    On the afternoon of December 19, 2014, three people robbed an independent pharmacy. They took cash, a purse and cell phone, and two bottles of promethazine with codeine, commonly known as "lean." At Suggs's bench trial, pharmacy employees Melene Jones and Leanna Gryz testified that they saw three men come into the pharmacy at around 2:30 p.m. Jones noticed the eyes of one of the offenders as "green and kind of buggy," and he wore a blue hoodie which had a "symbol of a horseshoe" on the front. On cross-examination, Jones agreed the horseshoe symbol is the logo of the brand "True Religion."

¶ 6    Jones saw the same person in the pharmacy each of the three days before the robbery. On December 18, a man came in wearing a similar hoodie. He came in with a woman, who asked

about medication. The man stood "behind her kind of peeking over the door." After Jones told them the pharmacy owner did not want the man in there, "him and the girl just turned around and left out." Surveillance footage from that day shows the man and the woman in the pharmacy for 20 seconds.

¶ 7     On December 17, Jones saw who she believed to be the same man and noticed "just skin tone, [and] his eye color. That's pretty much it." The man "came to the window and proceeded to ask [Jones] more questions about medication." There is no surveillance video from this day. On December 16, Jones saw the same man looking through a window in the pharmacy and asked if she could help him. That day she noticed the man's eyes, skin tone, height, and "small build." There is no surveillance video from this day either, but Jones estimated the entire encounter lasted 30 to 35 seconds.

¶ 8     Responding Chicago Police Officer Francisco Luevano testified that Jones told him that one of the robbers wore a black hooded sweatshirt and blue jeans and had brown eyes, another wore a black hoodie, and the third robber wore a red jacket. Gryz could not give a description of the offenders. Detective Ferguson similarly testified that Jones told him on the day of the robbery that one offender had brown eyes and wore a black hooded sweatshirt, dark pants and boots, another offender had a hoodie on and darker pants but she was unsure of his footwear, and she did not get a good look at the third offender. Jones told Ferguson that one of the robbers was at the pharmacy three consecutive days before the robbery.

¶ 9     A few days later, Detective Ferguson returned to the pharmacy and looked at surveillance footage from December 18 and 19 multiple times with Jones and Gryz. In the surveillance

footage from December 18, the offender who Jones identified as Suggs had on a dark colored hooded sweatshirt with white piping and a True Religion horseshoe logo on the chest.

¶ 10 The video footage from the day of the robbery shows 41 seconds elapsing between the time the three men walked up to the pharmacy counter to when they ran out of the store. One of the men wore a dark colored hooded sweatshirt with white piping and True Religion logo like the sweatshirt on the man who had been in the store the day before. The sweatshirt was tied tightly around the man's head and face, and he had a black mask covering the bottom half of his face— only his eyes were visible.

¶ 11 The trial court found Suggs guilty of robbery and unlawful restraint. Though both Jones and Gryz identified Suggs in court, because Gryz could not make a pretrial identification, the court found that "the case turns on the testimony and efficacy of the identification of Mr. Suggs by Ms. Jones." In finding the identification sufficient, the court emphasized that the person in the pharmacy on the 19th "was wearing his clothing in precisely the same manner as Mr. Suggs was the day before."

¶ 12 After a sentencing hearing, the court found that it was obligated to sentence Suggs as Class X offender based on his criminal history, which included a 2011 felony conviction for burglary and a 2012 felony conviction for robbery. The trial court sentenced Suggs to 16 years in prison.

¶ 13                                     Analysis

¶ 14 Suggs challenges his conviction on reasonable doubt grounds, arguing the State's key witness failed to reliably identify him. He also raises several challenges to his sentence—two arguments that the trial court erred in finding him eligible for Class X sentencing, and one

argument challenging his sentence as excessive. We find the State proved Suggs guilty beyond a reasonable doubt, but that the trial court erred in imposing a Class X sentence.

¶ 15                                    Reasonable Doubt

¶ 16    Suggs primarily argues that we should reverse his convictions outright because Jones's identification was so unreliable that the State failed to prove him guilty beyond a reasonable doubt. A challenge to a criminal conviction based on the sufficiency of the evidence asks whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Lloyd*, 2013 IL 113510, ¶42. We view all reasonable inferences in favor of the prosecution, and reverse should the evidence be so improbable, unsatisfactory, or inconclusive as to establish a reasonable doubt of guilt. *Id.*

¶ 17    To determine the reliability of eyewitness identifications, we look to the totality of the circumstances, and consider five factors: (i) the witness's opportunity to observe the offender at the scene, (ii) the witness's level of attention at the time of the crime, (iii) the accuracy of prior descriptions, (iv) the witness's level of certainty at the identification confrontation, and (v) the time between the crime and confrontation. *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972). Illinois courts also consider a sixth factor—the witness's acquaintance with the suspect. *People v. McTush*, 81 Ill. 2d 513, 521 (1980).

¶ 18                                  *Opportunity to Observe*

¶ 19    Suggs argues that Jones did not have a sufficient opportunity to view the offender's face during the robbery. When considering this factor, we examine "whether the witness was close

enough to the accused for a sufficient period of time under conditions adequate for observation." *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40.

¶ 20 We agree that Jones's opportunity to view the offender was brief and that the offender's hood had been pulled tight around his face and he wore a mask, leaving a small opening for his eyes. The surveillance video from the robbery shows that 41 seconds elapsed between the time the robbers approached the pharmacy counter and ran out of the store. Of those 41 seconds, Jones looked at the man she identified as Suggs for at least 15 of those seconds. We have repeatedly upheld convictions where the witness was able to observe the defendant for only "a few seconds" or "a couple of seconds." *People v. Negron*, 287 Ill. App. 3d 519, 531 (1998) (collecting cases). We find that the relatively short encounter does not diminish the reliability of Jones's identification and that the first *Biggers* factor weighs slightly in favor of the reliability of the identification.

¶ 21 *Degree of Attention*

¶ 22 Suggs argues that Jones's degree of attention could not yield a reliable identification. We acknowledge the high stress of this situation. The men barged into the drug dispensing area and ordered Jones and Gryz to the ground with a gun. Jones believed the men were going to kill her. Gryz was unable to give the police any description of the robbers because she was in shock and scared. Based on this testimony, Suggs relies on "weapon focus," the idea that the presence of weapons impairs eyewitness memory and identification accuracy. *See People v. Allen*, 376 Ill. App. 3d 511, 525 (1st Dist. 2007) (studies show witness's weapon focus "indicates less attention is paid to encoding the perpetrator's characteristics"); *People v. Clark*, 124 Ill. App. 3d 14, 21

(1st Dist. 1984) (psychological data shows "one tends to focus on a weapon which is pointed at him, rather than on the person holding it").

¶ 23    We accept the idea of weapons focus as a general matter, but our review of the surveillance video does not show Jones was overcome by fear of a weapon. At least once she confronts the man holding the gun and looks directly at his face. We find that Jones's degree of attention weighs slightly in favor of reliability as she does not appear to have been substantially impacted by the presence of a weapon.

¶ 24                                    *Previous Descriptions*

¶ 25    Suggs argues that Jones's different descriptions favor finding her identification unreliable. Jones testified that she gave the police the "best possible description" of the three offenders shortly after the robbery. She testified that she told the police the offenders' race and gender, and that Suggs had light skin and green eyes, was "pretty tall" and "kind of thin," and wore a blue hoodie and blue jeans. Officer Luevano, the responding officer, testified that both Jones and Gryz reported that one offender wore a black hoodie and had brown eyes, the second offender also wore a black hoodie, and the third wore a red jacket. Luevano testified that those were the only descriptions provided in the flash message.

¶ 26    Detective Ferguson testified that Jones told him on the day of the robbery that one offender had brown eyes and wore a black hooded sweatshirt, dark pants and boots; another offender had a hoodie on and darker pants but she was unsure of his footwear, and she did not get a good look at the third offender. Neither officer said Jones described the offenders' ages, weights, hairstyles, or any characteristics like a scar or eyeglasses.

¶ 27  The description Jones gave to the police contradicted her description of the offender at trial. Jones testified that the man, whom she identified as Suggs, wore a blue hoodie with a symbol of a horseshoe on it, brown Timberland boots, and blue jeans, and had distinguishing green eyes. Gryz also testified that the man had "very pretty" greenish-hazel eyes that stood out. But neither mentioned green eyes to the police, but rather reported that the man's eyes were brown.

¶ 28  We acknowledge the slight inconsistencies between Jones's description of Suggs's eye color and the color of his hoodie. We note that Jones denied telling the officers that Suggs had brown eyes. These inconsistencies are of the type that it was the trial court's job to resolve. *E.g., People v. Tenney*, 205 Ill. 2d 411, 428 (2002).

¶ 29  Suggs argues that Jones's identification of Suggs as one of the offenders had been likely influenced and cemented by her multiple viewings of the surveillance video from the day before, showing a woman in the pharmacy accompanying a man wearing a True Religion sweatshirt. We disagree. Jones gave most of her physical descriptions of Suggs to the officers before viewing the surveillance video. As to eye color specifically, we do not see how watching the video could have assisted Jones in identifying the color of anyone's eyes. The footage is not good enough to show it. Applying the deference we owe to the trial court's resolution of inconsistencies in the evidence, we find this factor weighs slightly in favor of the reliability of her identification.

¶ 30                    *Level of Certainty*

¶ 31  Suggs admits that the fourth *Biggers* factor, the witness's certainty at the time of identification may appear to support a finding of a reliable identification, but argues that Jones's certainty was influenced by her multiple viewings of the surveillance video from the day before

the robbery. We reiterate the view, expressed many times in majority and separate opinions in this court, that the factor of witness certainty is exceedingly unreliable. *People v. Fountain*, 2016 IL App (1st) 131474, ¶ 159 (Hyman, J. dissenting) (even the most confident witnesses are wrong 20% to 30% of the time); *People v. Starks*, 2014 IL App (1st) 121169, ¶ 72 (urging expert testimony on remand due, in part, to the "weak correlation between a witness's confidence in his or her identification and its accuracy"); *id.* at ¶¶ 85-9 (Hyman, P.J. specially concurring, joined by Pucinski, J.) (collecting cases)). Nevertheless, Suggs does not meaningfully challenge this factor and Jones was confident when identifying Suggs from the photo lineup. So we find that Jones's level of certainty at the time of identification weighs slightly in favor of reliability.

¶ 32                                *Time Between the Offense and Identification*

¶ 33    Suggs argues that the time between the event and the identification undermines the reliability of Jones' identification. The robbery occurred on the 19th and Jones made her identification of Suggs on the 26th. Only a week lapsed between the event and identification, we find that this factor weighs in favor of reliability. *E.g., People v. Simmons*, 2016 IL App (1st) 131300, ¶ 97 (approving time gap of up to two weeks).

¶ 34                                *Jones's Familiarity with Suggs*

¶ 35    Jones's testimony shows that she was familiar with Suggs's appearance, because he was in the pharmacy the day before. The trial court focused heavily on the fact that the robber "was wearing his clothing in precisely the same manner as Mr. Suggs was the day before." We have held that "a conviction should not be sustained on the basis of reference to clothing alone." *People v. Brown*, 131 Ill. App. 2d 717, 720 (1970) (citing *People v. Reed*, 103 Ill. App. 2d 342 (1968)). When it comes to identifications that rely on clothing, we have always required

something more. *E.g., People v. Brown*, 47 Ill. App. 3d 920, 927 (1977) (officers saw defendant committing offense, noted his clothing, and then identified him after a continuous chase) (citing *People v. Davis*, 95 Ill. App. 2d (1968) (same)); *People v. Ruderson*, 129 Ill. App. 2d 271, 279 (1970) (distinguishing case where defendant is identified "mainly by his clothing" as opposed to where "the victim recognized his face, his walk, his voice, his build and his ring"); *Brown*, 131 Ill. App. 2d at 720 (officer able to identify "defendant's face and clothing").

¶ 36    Here, Jones was able to provide descriptions of more than just Suggs's clothes. She described his build, his height, his skin tone, and his eye color. Because Jones's recognition of Suggs rests on more than a single article of clothing, we find this factor weighs in favor of the reliability of Jones's identification.

¶ 37    We recognize this is a close case. Faithfully applying the standard of review, however, requires us to find that the State proved Suggs guilty beyond a reasonable doubt. We affirm Suggs's conviction.

¶ 38                          Eligibility for Class X Sentencing

¶ 39    Suggs also argues that the trial court erred when it found him eligible for Class X sentencing on two grounds: (i) the first predicate offense, which he committed in 2011 at the age of 17, would have been adjudicated in Juvenile Court at the time of the present offense and should not count as a "conviction" for the purposes of the Class X statute; and, (ii) even if the 2011 offense counts as a "conviction," it was not entered in the proper sequence prescribed by the Class X statute because the sentence was imposed at the same time as the sentence for his second predicate offense. The State responds that, even if Suggs's 2011 offense would have been handled in the juvenile system under current law, the offense he committed still was classified as

a Class 2 offense. According to the State, the sequencing for the two predicate offenses was also proper.

¶ 40 Before we address the merits, the State urges us to decline review as forfeited. Ordinarily, a defendant's failure to object to an alleged sentencing error and failure to include that error in a postsentencing motion would forfeit the issue on appeal. *People v. Jackson*, 2011 IL 110615, ¶ 10. But, as Suggs correctly argues, "a sentence that is not statutorily authorized affects a defendant's substantial rights and will generally be reviewed, despite any possible forfeiture, under the second prong of the plain error doctrine." *People v. Foreman*, 2019 IL App (3d) 160334, ¶ 42. We note that the language of this exception— "a sentence that is not statutorily authorized"—sounds concerningly similar to the now-repudiated void-sentence rule. See generally, *People v. Castleberry*, 2015 IL 116916. But, we have previously held that statutorily non-conforming sentences, while they used to be void, also affect substantial rights and are amenable to traditional plain error review. *People v. Strawbridge*, 404 Ill. App. 3d 460, 470 (2010).

¶ 41 As a factual matter, we see no circumstance under which altering Suggs's sentencing range from 3-7 years to 6-30 years, in alleged contravention of a statute, would not affect his substantial rights. So we review Suggs's claim under the second prong of plain error.

¶ 42 The Class X enhancement statute provides:

> "When a defendant, over the age of 21 years, is convicted of a Class 1 or
>
> Class 2 felony *** after having twice been convicted in any state or federal court
>
> of an offense that contains the same elements as an offense now *** classified in
>
> Illinois as a Class 2 or greater Class felony *** and those charges are separately

brought and tried and arise out of a different series of acts, that defendant shall be sentenced as a Class X offender. This subsection does not apply unless:

(1) the first felony was committed after February 1, 1978 ***;

(2) the second felony was committed after conviction on the first; and

(3) the third felony was committed after conviction on the second."

730 ILCS 5/5-4.5-95(b) (West 2018). Suggs's first argument contends that his "first felony," as required by subsection (1), does not qualify as a valid predicate. This follows, he claims, because had he been charged with the predicate offense at the time he was charged with the present offense (2015), he would have been charged as a juvenile. And, according to him, juvenile adjudications are not "convictions" within the meaning of section 5-4.5-95(b).

¶ 43    As Suggs highlighted in a motion to cite additional authority, another division of this court, in an opinion authored by Justice Hoffman, recently ruled favorably to him on this question. *People v. Miles*, 2020 IL App (1st) 180736. We agree with *Miles* and apply it, though the application to Suggs's sentencing is slightly different.

¶ 44    The defendant in *Miles* received a Class X sentence based, in part, on a 2006 conviction for aggravated vehicular hijacking with a firearm and armed robbery. *Id.*, ¶ 3. This court found the defendant's 2006 conviction to be an invalid predicate because, had it been committed on the date of the present offense, it "would have been resolved with delinquency proceedings in juvenile court rather than in criminal proceedings." *Id.*, ¶ 11. The court reasoned that the language in section 5-4.5-95(b)—"an offense now *** classified in Illinois as a Class 2 or greater Class felony" required this result because the defendant's 2006 offense would not have been so classified had the defendant committed it in 2016. *Id.*

¶ 45    The logic continues that, because section 5-4.5-95(b) uses the word "conviction," and, in Illinois, a juvenile adjudication is not a "conviction," an offense that would have been resolved in juvenile court had it been committed in the present day did not fall within the plain language of the statute. *Id.*, ¶¶ 15-16 (citing *People v. Taylor*, 221 Ill. 2d 157, 176 (2006) (holding juvenile adjudications do not constitute convictions)). The court then, at some length, distinguished section 5-4.5-95(b) from other statutes expressly allowing the consideration of juvenile adjudications, see *id.*, ¶¶ 12-16, and from other cases decided before the Juvenile Court Act was amended to assert exclusive jurisdiction over minors who committed armed robbery. See *id.*, ¶¶ 18-21. We need not reiterate this analysis; suffice it to say, we find it persuasive.

¶ 46    *Miles* applies to Suggs's sentencing, although in a slightly different way. In *Miles*, when the defendant committed his first predicate offense in 2006 at age 15, he was nonetheless excluded from the jurisdiction of the juvenile courts because the aggravated vehicular hijacking offense he committed subjected him to criminal process in adult court. See 705 ILCS 405/5-130 (West 2006). In 2016, the legislature removed that offense from the list of offenses excluding minors from the jurisdiction of the juvenile courts. *Miles*, 2020 IL App (1st) 180736, ¶ 6 (citing Pub. Act. 99-258, § 5 (eff. Jan. 1, 2016) (amending 705 ILCS 405/5-130)).

¶ 47    We, however, are not dealing with the Excluded Jurisdiction provision of the Juvenile Court Act (§ 405/5-130). In 2011, Suggs was convicted of simple robbery, which would not have excluded him from juvenile court jurisdiction if he otherwise fell within it. See 705 ILCS 405/5-130 (West 2010). Suggs was excluded from juvenile court jurisdiction because of his age, 17. See 705 ILCS 405/5-120 (West 2010) (limiting juvenile court jurisdiction over minors under 17 for felony offenses). The General Assembly amended the Juvenile Court Act to assert

jurisdiction over minors under 18 in 2014. See Pub. Act. 98-61 (eff. Jan. 1, 2014) (amending 705 ILCS 405/5-120)). Thus, had Suggs committed the predicate offense in 2015, at the time of the present offense, the Act would have required the State to proceed with an adjudication in the juvenile system absent a successful petition for transfer. See 705 ILCS 405/5-805 (West 2016). The State makes no argument about the transfer provisions.

¶ 48    In 2015, Suggs's first predicate offense would have been a juvenile adjudication, not a criminal conviction, and, accordingly, it cannot be a valid predicate under the plain language of the Class X statute. *Miles*, 2020 IL App (1st) 180736, ¶ 22.

¶ 49    The State also filed a motion to cite additional authority. We initially denied the motion, but during oral argument, changed course and allowed its filing. The State's motion cites cases decided in 2015, 1990, 1984, and 1979—4, 29, 35, and 40 years before the State filed its initial brief. Suggs's arguments about Class X sentencing were in his original brief and the State was not surprised by them. We strongly urge the State (and defense counsel) to remember that motions to cite additional authority are used to draw this court's attention to relevant cases decided *after* the     submission of the briefs. They are not a repository for additional case research counsel wishes had been included in the original briefing.

¶ 50    The State cites *People v. Richardson*, 2015 IL 118255, where our supreme court affirmed the prospective application of the amendment to the exclusive jurisdiction provision of the Juvenile Court Act. We have no quarrel with that holding. But, we are not interpreting the Juvenile Court Act; we are interpreting the mandatory Class X statute, which requires us to imagine what a previous conviction would be classified as at the time of the present offense. We do not hold (and *Miles* did not hold) that Suggs's first predicate offense *is* a juvenile

adjudication; we hold that Suggs's first predicate offense *would be* a juvenile adjudication if committed at the time of the present offense. Accepting the prospective application of Section 405/5-120, that proposition is indisputably true.

¶ 51    The State next relies on *Fitzsimmons v. Norgle*, 104 Ill. 2d 369 (1984) and emphasizes this language: "The statutory definition of conviction \*\*\* would clearly include [the defendant]'s first offense even though he was a juvenile tried in adult court." *Id.* at 373. The State urges us to conclude that convictions do not lose their status as convictions by virtue of a defendant's young age. But the State's own emphasis defeats its position—there, the defendant was "a juvenile tried *in adult court*." In other words, the State is right that a conviction obtained in adult court is no less a conviction because the offender was a juvenile. But here, had Suggs been tried for his first predicate in 2015, he would not have been a juvenile tried in adult court; rather, he would have been a juvenile adjudicated delinquent in juvenile court. *Fitzsimmons* does not negate the reasoning in *Miles*.

¶ 52    The State's citation to *In re Greene*, 76 Ill. 2d 204 (1979), is similarly unavailing. *Greene* holds that a minor's age is not an element of the offense with which the minor is charged when he or she is accused of being delinquent under the Juvenile Court Act. *Id.* at 212. According to the State, this holding defeats Suggs's argument because Suggs purportedly claims that "the elements of the offense had changed since he could not have been prosecuted for burglary in 2015 since he [was] only 17 at the time of the offense." The State does not cite Suggs's briefs for that gloss on his argument, and we do not find it anywhere. Suggs is not arguing that the elements of his first predicate offense had changed; he argues that, in 2015, the State would have had to prove those elements in juvenile court, not adult court.

¶ 53    Finding none of the State's additional authority place any doubt on *Miles*, we vacate Suggs's sentence and impose a new sentence of seven years.

¶ 54    Considering our disposition, we need not address Suggs's other sentencing arguments. In the interest of completeness, the fourth case the State relies on in its motion to cite additional authority, *People v. Franklin*, 135 Ill. 2d 78 (1990), addresses one of Suggs's other sentencing arguments, and, as we are not reaching those arguments, we do not address *Franklin*.

¶ 55    After our original disposition, Suggs filed a petition for rehearing and motion for release on bond pending further appeal. The petition for rehearing urges us to exercise our authority under Illinois Supreme Court Rule 615 to impose a seven-year sentence (the Class 2 maximum) as opposed to remanding for resentencing. Suggs argues that he has already served the maximum amount of time he would be required to serve on a seven-year sentence and that, in light of the COVID-19 pandemic, health concerns require his immediate release.

¶ 56    We allowed rehearing and ordered the State to file a response to Suggs's petition for rehearing and the bond motion. We also received and considered Suggs's reply.

¶ 57    The State responds that we should decline to exercise our Rule 615 authority because the trial court could have sentenced Suggs to a discretionary extended term of up to 14 years based on his criminal history. The State also urges we reject Suggs's request for bond, but offers, in the alternative, a list of conditions that should be imposed were we to grant the motion.

¶ 58    As to Suggs's argument that we should impose a seven-year sentence without a remand, we, undoubtedly, have the authority to impose a new sentence when we find "the trial court's sentencing decision was unlawful or an abuse of discretion." *People v. Jones*, 168 Ill. 2d 367, 378 (1995); Ill. S. Ct. Rule 615(b)(4). We are to use that power "cautiously and sparingly." *Id.* In

deciding whether to invoke Rule 615(b)(4), we consider "all of the surrounding circumstances of each particular case" including the presence or lack of additional evidence to offer on remand, whether the proof presented to the trial court the first time was "relatively straightforward and uncomplicated," and whether it would unnecessarily burden the court and the parties to remand for resentencing. *Id.*

¶ 59    Although we vacated Suggs's Class X sentence, Suggs is eligible for a discretionary extended term sentence as a Class 2 offender. See 730 ILCS 5/5-5-3.2(b)(1) (West 2018). The sentencing range for an extended term for a Class 2 offense is 7 to 14 years.  Because an extended term is not mandatory, on remand, Suggs's sentencing range would functionally be 3 to 14 years.

¶ 60    Suggs points to two cases in which Illinois courts vacated extended term sentences and imposed the maximum non-extended term sentence where it was clear that the trial court's intent was to impose the maximum available penalty. *People v. Reese*, 2017 IL 120011, ¶ 85; *People v. Ware*, 2014 IL App (1st) 120485, ¶ 32. The State points to other cases where we have said resentencing is the best way forward when the trial court imposed a sentence relying on the wrong sentencing range. *People v. Hall*, 2014 IL App (1st) 122868, ¶ 15 (citing *People v. Owens*, 377 Ill. App. 3d 302, 305-06 (2007)). The State also argues that we took a different course in *Miles*, the case we relied on to vacate Suggs's Class X sentence; but, there, this court declined to exercise its authority to impose a lesser term of mandatory supervised release as the defendant's IDOC status was "absconder" and his discharge date was "to be determined." *Miles*, 2020 IL App (1st) 180736, ¶ 23. No similar impediment applies here.

¶ 61 Our review of the case law does no more than confirm what Suggs argues: we retain broad discretion under Rule 615(b)(4). We have imposed sentence ourselves when the trial court sentenced under the wrong sentencing range (*Ware*) and we have declined to do so under similar circumstances (*Hall* and *Owens*). Ultimately, the balancing considerations in *Jones* guide us.

¶ 62 Importantly, under *Jones*, the State has not pointed to new information that would be available to the trial court at resentencing. The State also has not directed us to information the trial court relied on that was particularly complicated or unusual. In light of COVID-19 and the Illinois Supreme Court's recent ruling setting out slow reopening of the circuit courts, see *In re Illinois Courts Response to COVID-19 Emergency*, M.R. 30370 (May 21, 2020), we find substantial costs to both the court and the parties in returning this case to the circuit court. We will exercise our authority under Rule 615(b)(4) to "reduce the punishment imposed by the trial court."

¶ 63 The State's response agrees that the record shows the trial court's intent to impose "a mid-range sentence in what it believed to be the applicable Class X range." So, this case is not so far off from *Reese* and *Ware*, where we exercised our authority to impose a new sentence in line with the trial court's expressed intent. We also find the trial court would likely have imposed an extended term sentence given its 10-year departure from the Class X minimum. We agree that a mid-range sentence accounts for both the seriousness of Suggs's offense (robbery at gun point) and his criminal history (one similar offense) as well as taking mitigation into consideration— Sugg's relatively young age at the time of offense, relatively short criminal history, and that he was not personally armed. We grant Suggs's request and impose a sentence of seven years,

which is both the ordinary Class 2 maximum and near the midpoint of the extended Class 2 sentencing range.

¶ 64     In support of his motion for an appeal bond, Suggs argues that any sentence under 10-and-a-half years is satisfied by the 5 years, 2 months, and 19 days of actual time he as served. According to Suggs this mean he will have served "significantly more time than legally authorized before [our] mandate issue[s]." That is incorrect. Our imposition of a seven-year sentence means that the Department of Corrections is "legally authorized" to keep Suggs incarcerated for seven years. Suggs's reliance on his anticipated good time credit is misplaced reliance on credit DOC is not required to give. *People v. Peacock,* 2019 IL App (1st) 170308, ¶ 19 (quoting *People ex rel. Colletti v. Pate*, 31 Ill. 2d 354, 357 (1964) ("Good time, although part of every sentence is a conditional right which may be forfeited")). At all times and at any time, DOC could revoke Suggs's good time credit and he could serve the entire seven-year term of his sentence.

¶ 65     That said, even where a defendant has many years left on his sentence, we have the authority to order Suggs "admitted to bail and the sentence or modifying condition of imprisonment *** stayed, with or without bond." Ill. S. Ct. Rule 609(a) (eff. Feb. 6, 2013). The rule expressly gives that authority to both the trial *and* reviewing courts. *Id.* We first address Suggs's COVID-19 concerns, as they are the most pressing. In his motion for an appeal bond, he argues that "prisons are especially dangerous closed spaces." To support that claim, in his rehearing reply, he cites to a DOC memorandum about COVID-19, which confirms that at least one person at the facility where Suggs is incarcerated has tested positive for the illness. See Illinois Department of Corrections COVID-19 Response Memorandum, (May 4, 2020)

([www.illinois.gov/idoc/facilities/Documents/COVID-19/CommunicationsCustody/COVID-19%20Update%202.pdf](www.illinois.gov/idoc/facilities/Documents/COVID-19/CommunicationsCustody/COVID-19%20Update%202.pdf)). He also cites a DOC information page showing a total of 386 COVID-19 cases DOC-wide with 323 of those cases ending in full recovery so far. See COVID-19 Response ([www.illinois.gov/idoc/facilities/Pages/Covid19Response.aspx](www.illinois.gov/idoc/facilities/Pages/Covid19Response.aspx)) (last visited May 24, 2020). We may take judicial notice of information on the DOC's website. *People v. Lindsey*, 2016 IL App (1st) 141067, ¶ 28.

¶ 66    We consider the threat of COVID-19 serious, but the same page that Suggs cites shows that the only case occurring in the facility where he is held has been from a staff member. See COVID-19 Response. To date, no inmate has contracted the illness. *Id.* We must deal with the threat as it exists now; we cannot rely on system-wide data when the localized infection rate for the facility housing Suggs remains low.

¶ 67    In light of the COVID-19 information we have, the State's arguments carry substantial force. Initially, we note that the Class 2 felony of which Suggs was convicted is a bailable offense. See 725 ILCS 5/110-4(a) (West 2014). The factors courts use to determine the amount of bail or conditions of release are too numerous to list. 725 ILCS 5/110-5(a) (West 2018). We can narrow our focus based on the State's arguments. According to the State, we should deny an appeal bond because: (i) Suggs's criminal history includes "multiple forcible felonies"; (ii) he has failed to "conform his conduct to the law" after unsuccessful attempts at probation and supervised release; (iii) the crime relevant here was violent because of Suggs's conduct and his co-offender's decision to carry a gun. We agree. The conduct, and the nature of Suggs's previous convictions, carries an imminent risk of violence. Suggs showed a willingness to re-offend shortly after his previous releases. Moreover, the mitigation Suggs relies on, in our view, speaks

more to the substance of his sentence and gives us little comfort that he would be less likely to reoffend were we to release him.

¶ 68     We grant Suggs's petition for rehearing and impose a seven-year sentence for the Class 2 offense of robbery. We deny Suggs's motion for an appeal bond at this time. The State has indicated its intent to file a petition for leave to appeal. Nothing in this order prevents Suggs from repeating his request for an appeal bond in the supreme court.

¶ 69     Affirmed as modified.